[No. F002934. Fifth Dist. Nov. 6, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MARVIN LEOL STATLER et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through VI.

---

---

**COUNSEL**

Howard M. Hoffman and David K. Kuwahara, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, James T. McNally, Nancy Sweet and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**BEST, J.**—Following trial by jury, defendants were convicted of burglary. (Pen. Code, § 459.) Following discussion, we will reject the contentions on appeal of each defendant in turn and affirm the judgments.

### STATEMENT OF FACTS

Defendants were convicted of burglarizing Juanita Petty's residence in Bakersfield. The prosecution's case consisted of the following facts: Aneta Adams testified that she first saw defendant Statler and defendant Brown driving through her neighborhood on April 18, 1983, at 11:30 in the morning. The two men were in a maroon car and were driving very slowly throughout the neighborhood looking at all of the houses. Mrs. Adams was suspicious of the two men because neither lived in the neighborhood and because they were driving throughout the neighborhood so slowly. Mrs. Adams was in her car on the way to the market, so she decided to follow the men. At one point when the defendants realized that she was watching them, they turned their heads and covered their faces with their hands. Mrs. Adams wrote down the license plate number of the car, which was 989 MBP. Later, she observed that defendant Brown had gotten out of the car and was walking toward Juanita Petty's residence, which is located on Misty Court. Mrs. Adams last saw defendant Brown standing in front of Juanita Petty's residence. Mrs. Adams positively identified both defendants Statler and Brown as the two men who were in the maroon car.

Mrs. Tate, who lives directly across the street from the Petty residence, testified that on April 18 at approximately 11:30 in the morning, she ob-

served defendant Brown approach the door to the Petty residence and knock several times. Brown was wearing a black baseball cap. She then saw defendant Brown disappear behind some bushes in front of the Petty residence. She observed defendant raise his head, scan the neighborhood and jump over the fence. She continued to watch the house, and eventually, she saw the defendant standing in an upstairs bedroom. While she was watching the house, the maroon car drove back through the court once. Mrs. Tate then called her neighbor Phil Harrington and informed him of the suspected burglary.

Mr. Harrington testified that he went to Juanita Petty's residence but did not observe any persons in the yard at that time. However, back at his own home he observed defendant Statler drive through the court in the maroon car and glance furtively at the Petty residence. Mr. Harrington then got into his own car and followed the maroon car as it drove slowly through the neighborhood.

Police Officer Jack Smith was the first to respond to the burglary call on Misty Court. As he drove into the court, he saw a man standing in front of the Petty residence. A branch of a tree was blocking his view, so he could see the person only from the waist down. As soon as Officer Smith got out of his car and walked toward the person, the person bolted. Officer Smith lost sight of the person, but he could hear the person moving quickly throughout the backyards of the houses on the court. This person apparently was jumping fences and running through bushes to make his escape. Officer Smith managed to confront the person on a street nearby. He saw the person step out of some foliage into the front yard of a house and noted that the person was wearing jeans and a black baseball cap. He ordered the person to halt; however, the person ran back into the bushes. By this time, other units had been called into the area, and the defendant was apprehended shortly thereafter by Officer Scott on a street several blocks away from Misty Court. By the time Officer Scott approached. defendant, defendant was wearing no cap and no shirt. Defendant told Officer Scott he was in the area looking for a job. Dan Quick, the owner of the house in front of which defendant was standing, stated the defendant was not employed by him nor was he looking for additional employees. Defendant's hat, shirt and glove were recovered from the bushes in front of Dan Quick's house.

After defendant was apprehended, Officer Smith returned to the Petty residence. In the backyard, Officer Smith observed that the back door leading into the garage was open as well as the door leading from the garage to the kitchen. A piece of wood on the back kitchen door had been chipped away at the lock. A pillowcase full of Mrs. Petty's costume jewelry had been taken from her bedroom and left on the grass in the backyard. Police

Officer Hillis arrested defendant Statler as Statler drove around the neighborhood.

Defendant Brown's theory of defense was that Kathy Mixon, Juanita Petty's daughter, staged the burglary to have defendant arrested. Defendant had dated Kathy Mixon several months prior to the burglary. He testified that Kathy Mixon was a drug user and that he had threatened to reveal her drug use to her mother. He testified she told him she would "get him" if he told her mother. Defendant then had moved out of the area and had not dated Ms. Mixon for several months. He testified that he happened to be in town on the day of the burglary to go to his union, so he decided to call Ms. Mixon. Ms. Mixon purportedly invited him to come over to her house that day. When defendant got into the neighborhood, he could not remember exactly where Ms. Mixon lived, so he and defendant Statler had to drive around the neighborhood very slowly to look for the house. As soon as defendant Brown spotted the correct house, he told defendant Statler to take the car and go get some gas. After Statler left, he walked to the front of the house and knocked on the door, but nobody answered. He then testified he heard a stereo in the backyard and decided to go to the back to see if Kathy Mixon was sunbathing by the pool. When he jumped over the fence, he noted that a pillowcase full of jewelry had been spilled on the grass. He then determined that he had been set up. He jumped back over the fence, and when he saw the policeman walking toward the house he panicked and ran. Defendant claimed to have discarded his shirt and cap because he was sweating.

Defendant Statler's testimony roughly parallels that of defendant Brown. Defendant Statler claimed that defendant Brown asked him to accompany Brown to the union hall that morning. The two men drove to the union hall and then had breakfast. Defendant Brown then told defendant Statler that he wished to see Kathy Mixon so the two men drove to her neighborhood and had to search the neighborhood for the correct house when defendant Brown could not remember exactly which house belonged to Ms. Mixon. When defendant Brown recognized the house, he got out of the car, gave defendant Statler some gas money and told him to take the car to get gas. Defendant Statler then went to get gas and when he came back, he could not remember exactly where the house was or the area in which he had dropped off defendant Brown, so he was driving around the neighborhood looking for the correct area when the police arrested him.

In rebuttal, Kathy Mixon testified that she never received a phone call from defendant Brown the day before the burglary, nor did she ever invite him to her mother's house on the morning of the burglary. She denied trying to set up defendant Brown and having threatened to get even with defendant

Brown. Officer Hillis testified in rebuttal to defendant Statler's testimony. In response to the burglary dispatch, Officer Hillis made a stop of a maroon car that was being driven by defendant Statler. Officer Hillis asked Statler where his friend was, to which defendant Statler replied he did not have a friend. Officer Hillis then asked defendant Statler what he was doing in the area. In answer to this question, defendant Statler said that he was looking for the freeway and had been looking for the freeway for the last 20 minutes.

DISCUSSION

I

*Did the trial court prejudicially err in admitting defendant Brown's prior felony conviction for impeachment purposes?*

At the close of the People's case, the trial court heard a motion by defendant Brown to exclude his 1980 felony conviction of burglary for impeachment purposes. The trial court ruled that, pursuant to Proposition 8, the prior conviction would be admissible for impeachment purposes. The trial court further noted that if *People v. Beagle*[1] and its progeny represented the current state of the law, it would exclude the use of the burglary conviction as being substantially similar to the present crime charged against defendant. Despite the trial court's ruling, defendant testified at trial. For tactical purposes, defendant's trial counsel questioned him about the prior burglary conviction on direct examination. No mention of the prior was made by the prosecutor on cross-examination. ▆ Defendant contends that, under *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], the denial of his motion to exclude prior felony convictions constituted prejudicial error.

▆ The California Supreme Court in *People v. Castro* interpreted the provision of Proposition 8 that allows for the admission of any felony conviction for impeachment purposes in a criminal proceeding. (See Cal. Const., art. I, § 28, subd. (f).) The Supreme Court's conclusion is succinctly stated as follows: "We shall hold that—always subject to the trial court's discretion under section 352—subdivision (f) authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty. On the other hand, subdivision (d), as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude." (*People v. Castro, supra,* 38 Cal.3d at p. 306.)

---

[1] (*People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1].)

According to *Castro,* only those felonies that involve moral turpitude are relevant to impeach a witness' credibility. Moral turpitude is loosely defined by the Supreme Court as a readiness to do evil. The *Castro* court noted that determining whether a prior conviction in a given case involved moral turpitude would be a difficult task for the trial court. For guidance, the Supreme Court suggested that the trial court may refer to other bodies of law that have developed rules concerning felonies involving moral turpitude, for example, California case law on attorney discipline and federal case law on alien deportation. (*Castro, supra,* at p. 316, fn. 11.) Finally, the court imposed the rule that only when the least adjudicated elements of the felony conviction necessarily involve moral turpitude may the conviction be used for impeachment purposes, citing *People* v. *Crowson* (1983) 33 Cal.3d 623, 633-635 [190 Cal.Rptr. 165, 660 P.2d 389] and *In re Finley* (1968) 68 Cal.2d 389, 392-393 [66 Cal.Rptr. 733, 438 P.2d 381]. (*People* v. *Castro, supra,* 38 Cal.3d at pp. 316-317.)

■ Clearly, in determining whether a particular prior felony conviction was for a crime involving moral turpitude, the trial judge may not look behind the fact of conviction to the facts underlying the conviction. Instead, the court must look to the statutory definition of the particular crime and only if the least adjudicatory elements of the crime necessarily involve moral turpitude is the prior conviction admissible for impeachment purposes. (See *People* v. *Jackson* (1985) 37 Cal.3d 826, 836 [210 Cal.Rptr. 623, 694 P.2d 736].)

In *Castro,* the Supreme Court recognized that "Obviously it is easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a . . . 'general readiness to do evil.'" (*People* v. *Castro, supra,* 38 Cal.3d at p. 315.)

■ *Castro,* then, stands for the proposition that before a prior felony conviction will be admitted for impeachment purposes, the conviction must be demonstrated to be relevant to the credibility of the witness. If relevance is not established, a defendant-witness' right to due process is violated. (*Castro, supra,* at pp. 313-314.)

By definition, the least adjudicated elements of defendant's prior burglary conviction were: (1) entry into a specified building or structure, (2) with the specific intent to commit, (3) theft or any felony. (Pen. Code, § 459.) Defendant Brown, while conceding that entry with the intent to commit theft would be a crime involving moral turpitude, argues that when the intent is to commit a felony not itself involving moral turpitude, the burglary could not constitute a crime involving moral turpitude. Or, so it is argued, it is

the intent with which entry is made that may or may not evince a "readiness to do evil."

Since the trial court is not permitted to go behind the fact of conviction and take evidence on the facts underlying the conviction in determining whether the felony necessarily involves moral turpitude, it cannot determine whether the burglary conviction was based on defendant's intent to commit theft, or on his intent to commit a felony involving moral turpitude, or on his intent to commit a felony not involving moral turpitude. Therefore, unless all burglaries involve moral turpitude, the court could not find that a particular burglary conviction was for a crime involving moral turpitude.

In *People* v. *Gauze* (1975) 15 Cal.3d 709, 715 [125 Cal.Rptr. 773, 542 P.2d 1365], the Supreme Court noted: "As aptly articulated by the Court of Appeal in *People* v. *Lewis* (1969) 274 Cal.App.2d 912, 920 [79 Cal.Rptr. 650], 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.' [Penal Code] Section 459, in short, is aimed at the danger caused by the unauthorized entry itself."

The essence of the crime of burglary, then, is the unauthorized entry with the dangers inherent thereto and not simply the intent to commit a crime, whether or not that crime involves moral turpitude.

We are of the view that entry into a building or structure with the secret intent to commit theft or *any* felony therein not only evinces dishonesty on the part of the perpetrator, but also necessarily evinces the perpetrator's "readiness to do evil." (See *People* v. *Castro, supra,* 38 Cal.3d at pp. 313-315.) Every burglary conviction, therefore, is relevant on the issue of credibility and is admissible to impeach the testimony of any witness, including a defendant-witness.

Our inquiry does not end here, however. Under *Castro,* the trial court retains the discretion to exclude a prior felony conviction under Evidence Code section 352 if the probative value of the conviction is outweighed by its prejudicial effect. The trial court stated it would have excluded the prior burglary conviction except for Proposition 8. The trial court erred, then, in failing to exercise its discretion as mandated by *Castro.*

The question remains whether the error was prejudicial. The error may be deemed harmless if "After a review of the entire record we are of the opinion that it is not reasonably probable that a result more favorable to defendant would have occurred in the absence of error." (*People* v. *Castro, supra,* 38 Cal.3d at p. 319; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Undoubtedly, the prior conviction was prejudicial, particularly since it is identical to the crime for which defendant is on trial. However, the evidence of guilt presented at trial was overwhelming. Defendant Brown and his codefendant Statler were seen casing the neighborhood. Aneta Adams testified that she observed the two men driving very slowly through the neighborhood, going down all of the streets and looking at all of the houses. She also testified that when the men realized she was watching them, they both put their hands up in front of their faces and turned their heads to hide their faces from view. She also observed the defendant walking toward Misty Court, which is the court in which the burgled house is located. She last saw defendant Brown standing in front of Juanita Petty's house. Martha Tate testified that she saw defendant go to Juanita Petty's front door and knock twice. He then disappeared behind a group of bushes that stands in front of the house. She observed defendant step out from the bushes, scan the neighborhood and then jump over the back fence. Next, she observed the defendant in the upstairs bedroom of Mrs. Petty's house. She positively identified defendant Brown as the man standing in the house. The evidence further showed that after defendant exited the house and was standing in the front yard by the bushes, Police Officer Smith responded to a burglary call. As soon as defendant saw Officer Smith walking toward the house, he ran away, and Officer Smith gave chase. Defendant Brown finally was arrested by Officer Scott. Officer Scott also had responded to the burglary call and found defendant standing in front of a house on Emerson, which is a few streets away from Mrs. Petty's residence. Defendant Brown appeared out of breath, was sweating and had no shirt. When Officer Scott asked him what he was doing in the area, defendant told him he was looking for a job. The homeowner of the house on Emerson, however, arrived at that point and told the officer that defendant did not work for him nor was he looking for hired help at the time. Defendant's hat and shirt were found in the bushes in front of the homeowner's house. Back at Juanita Petty's house, police officers found a pillowcase full of costume jewelry lying on the grass in the backyard. The kitchen door had been broken open.

Furthermore, the prosecutor did not dwell on the fact of defendant's prior felony conviction. He did not mention the prior felony conviction on cross-examination at all, and in his closing argument, it was mentioned briefly once. Even without the use of the prior felony conviction, the jury would

have had no difficulty in disbelieving any testimony of the defendant. Defendant's flight from the scene of the crime is certainly strong evidence of guilt. Plus, defendant admitted on cross-examination that he lied to Officer Scott when Officer Scott asked him what he was doing in the area. Furthermore, defendant's theory of defense, if not inherently unbelievable, was at best, very weak.

Defendant testified that Mrs. Petty's daughter, Kathy Mixon, set him up. The evidence showed that he and Kathy Mixon had dated each other earlier in the year. They stopped seeing one another several months before the burglary. Defendant testified that he had called Kathy because he was going to be in town and wished to see her. She told him to come over to the house and, if she did not answer the front door, to come around to the backyard where she would be sunbathing. Although he had dated Kathy for several months and had been to her house on several occasions, he testified that he was not sure which house was hers; therefore, he and defendant Statler were forced to drive slowly around the area looking for the correct house. Once he found the house, he testified that no one answered the front door and that he jumped over the back fence to see if Kathy was in the backyard. In the backyard, he found that a pillowcase full of costume jewelry was lying on the grass and that Kathy was nowhere to be seen. He then decided that he had been set up, got paranoid when he observed the policeman walking toward the house and tried to make good his escape by running through the backyards of the neighboring houses. Defendant further testified that Kathy Mixon was a drug user and that she had threatened to "get him" when he told her he would reveal to her mother that she was using drugs. This, he felt, explained the reason for the set up.

However, Kathy Mixon testified in rebuttal that she had not seen defendant for several months and, furthermore, had received no call from him requesting to see her. She did not invite defendant to her mother's house on the day of the burglary and was never present at the house on that day. Defendant never produced any solid evidence that Kathy, in fact, had been a drug user. If defendant truly had been set up, it would have made more sense for him to stop and explain his presence at the house to the police officer. Furthermore, the fact that he lied to Officer Scott before being arrested served to discredit his entire testimony. It is not reasonably probable that the jury would have come to a different conclusion absent the admission of defendant's prior conviction of burglary to impeach him. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.) Furthermore, on the facts of this case, even under the more rigorous standard of prejudice required by *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065], we can confidently say that the error was harmless beyond a reasonable doubt.

II-VI\*

. . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgments are affirmed.

Woolpert, Acting P. J., and Fitch, J.,† concurred.

The petition of appellant Statler for review by the Supreme Court was denied February 14, 1986.

---

\*See footnote on page 46, *ante*.
†Assigned by the Chairperson of the Judicial Council.