# Ronald Dale Yeatts

## v.

# Commonwealth of Virginia

Record Nos. 910339 and 910340

September 20, 1991

Present: Carrico, C.J., Compton, Stephenson, Russell,* Whiting, Lacy, and Hassell, JJ.

---

* Justice Russell participated in the hearing and decision of this case prior to the effective date of his retirement on July 1, 1991.

George A. Jones, Jr.; David A. Furrow for appellant.
Kathleen B. Martin, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

In the first phase of a bifurcated trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Ronald Dale Yeatts of robbery and capital murder in the commission of robbery while armed with a deadly weapon. The jury fixed Yeatts's punishment for robbery at 20 years in the penitentiary. In the second phase, the jury fixed Yeatts's punishment for capital murder at death, based upon a finding of "future dangerousness."

After considering a post-sentence report prepared by a probation officer, Code § 19.2-264.5, the trial court imposed the sentences fixed by the jury. Yeatts is here for automatic review of his death sentence, and we have consolidated that review with his appeal of his capital murder conviction. Code § 17-110.1. We have also certified from the Court of Appeals Yeatts's conviction for robbery, Code § 17-116.06, and we have given the entire matter priority on our docket, Code § 17-110.2.

According to established principles, we will state the evidence in the light most favorable to the Commonwealth. On the afternoon of September 23, 1989, Yeatts and a friend, Charles Michael Vernon, drank beer and smoked marijuana and crack cocaine together.[1] Yeatts asked Vernon whether he knew anyone "that had any money or anything." Vernon said he knew "this lady that might have some money."

With Vernon driving, the two men started out for the home of 70-year-old Ruby Meeks Dodson in rural Pittsylvania County. Vernon and his father had earlier performed plumbing work for Ms. Dodson, and Vernon knew she kept money in her home.

As they neared the Dodson place, Yeatts asked Vernon if he had a knife, and Vernon handed over a pocket knife with a three-inch blade. When Vernon stopped the car in front of the house,

---

[1] Vernon was the Commonwealth's principal witness at Yeatts's trial. Vernon entered a plea of nolo contendere to robbery and first degree murder in connection with the event involved in this case and was awaiting sentencing at the time he testified against Yeatts.

Yeatts told him to "pop the hood," and the two alighted from the vehicle and looked at the motor.

Ms. Dodson "stepped out" and asked what the two men wanted. Yeatts told her they were having car trouble and asked "something about the phone." Yeatts then requested a glass of water, and when Ms. Dodson brought it to him, he handed it to Vernon, who poured it out. Yeatts asked for another glass of water, and, as Ms. Dodson stepped inside to get it, Yeatts followed her into the house. Vernon also entered the house and went directly to the bedroom, where he "assumed [Ms. Dodson] kept her money," and began searching through drawers but found nothing.

While in the bedroom, Vernon heard someone say, "[o]h Lord." Yeatts then came into the bedroom and "started going through the drawers [but] didn't find anything [and] wiped off a few knobs on the dresser." Yeatts then "grabbed a pocketbook" and said, "let's go." The two men returned to the car. Vernon observed that Yeatts still held the knife and had blood on his hand. Vernon said to Yeatts, "you didn't kill her did you?" Yeatts replied, "I cut her throat, don't worry about it, drive." When Vernon "asked [Yeatts] why," Yeatts said: "[B]ecause she seen [my] face."

Upon examining Ms. Dodson's pocketbook, Yeatts found it contained a sum of money, which he divided into two piles. Vernon's share amounted to approximately $700. The pair drove to a riverbank. There, Yeatts first tried to burn the pocketbook and then threw it and the knife into the river.[2]

Later the same afternoon, a neighbor went to the Dodson home and discovered Ms. Dodson's body in the kitchen. Ms. Dodson had been stabbed numerous times, her throat had been slashed, and she was lying in a pool of blood.

Police officers soon arrived on the scene and began an investigation. They found bloody shoe prints on the kitchen floor and on a floor mat. Later analysis showed that the shoe prints conformed in size and sole design to tennis shoes seized from Yeatts, and not to shoes seized from Vernon.

The police also discovered a pair of sunglasses on the kitchen floor "approximately two feet from Ms. Dodson's right foot." A

---

[2] After his arrest, Vernon directed investigators to the riverbank, where Ms. Dodson's driver's license and some burnt material were found.

fingerprint found on the sunglasses matched the print of Brenda Dalton, Yeatts's girlfriend, who lived with him in his parents' home. No evidence placed Brenda Dalton at the crime scene.

After his arrest, Yeatts gave the police several statements in which he implicated himself in Ms. Dodson's death. He also admitted to his sister-in-law, Debbie Yeatts, that he killed Ms. Dodson.[3]

## I.

## ISSUES PREVIOUSLY RESOLVED.

█ On appeal, Yeatts raises a number of issues which have been resolved by previous decisions of this Court. Because Yeatts has advanced no persuasive reason why we should depart from the views previously expressed, we will reaffirm the earlier decisions and reject Yeatts's contentions. The issues Yeatts raises and decisions resolving them are as follows:

Virginia's death penalty statutes fail to guide the jury's discretion. Resolved by *M. Smith v. Commonwealth*, 219 Va. 455, 476-77, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979).

The use of prior convictions as evidence of future dangerousness constitutes double jeopardy. Resolved by *Watkins v. Commonwealth*, 238 Va. 341, 352, 385 S.E.2d 50, 56 (1989), *cert. denied*, 494 U.S. 1074 (1990).

The death penalty constitutes cruel and unusual punishment. Resolved by *M. Smith*, 219 Va. at 476, 248 S.E.2d at 148.

The jury instructions and verdict forms employed at the penalty stage tend to inhibit the jury from giving independent weight to mitigating factors. Resolved by *LeVasseur v. Commonwealth*, 225 Va. 564, 595, 304 S.E.2d 644, 661 (1983), *cert. denied*, 464 U.S. 1063 (1984).

Virginia denies capital defendants meaningful appellate review. Resolved by *Stockton v. Commonwealth*, 241 Va. 192, 216, 402 S.E.2d 196, 210 (1991).

The reference in Code § 19.2-264.2 to the "past criminal record of convictions of the defendant" is in conflict with the refer-

---

[3] Debbie's testimony concerning the admission by Yeatts was given during the guilt phase of the trial. In the penalty phase, she testified that on one occasion Yeatts raped her. She admitted, however, that she had an affair with Yeatts both before and after the alleged rape.

ence in Code § 19.2-264.4(C) to the "prior history of the defendant." Resolved by *LeVasseur*, 225 Va. at 593-94, 304 S.E.2d at 660.

Refusal to provide a court-appointed private investigator denies meaningful access to justice. Resolved by *Gray* v. *Commonwealth*, 233 Va. 313, 330, 356 S.E.2d 157, 166, *cert. denied*, 484 U.S. 873 (1987).

Use of death qualification voir dire questions denies a defendant the right to a jury representative of a cross-section of the community. Resolved by *Pruett* v. *Commonwealth*, 232 Va. 266, 277-78, 351 S.E.2d 1, 7-8 (1986), *cert. denied*, 482 U.S. 931 (1987).

Additional peremptory challenges are necessary in capital cases to ensure that a sentence of death is not the result of arbitrary factors or prejudice. Resolved by *Buchanan* v. *Commonwealth*, 238 Va. 389, 405, 384 S.E.2d 757, 767 (1989), *cert. denied*, 493 U.S. 1063 (1990).

A capital defendant should be allowed to explain to the jury his parole eligibility in the event a life sentence is imposed. Resolved by *Stamper* v. *Commonwealth*, 220 Va. 260, 277-78, 257 S.E.2d 808, 820-21 (1979), *cert. denied*, 445 U.S. 972 (1980).

## II.

## PRETRIAL MATTERS.

### a. Motion to Suppress Statements.

Yeatts was arrested on September 28, 1989, the fifth day after Ms. Dodson's murder, by Michael Taylor, an investigator for the Pittsylvania County Police Department. At the time of the arrest and later at the Sheriff's Department, Taylor gave Yeatts the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Speaking of the "offense itself," Yeatts said: "This is b____ s____."

In a pretrial motion, Yeatts sought the suppression of four statements he made to the police following his arrest, and he assigns error to the trial court's denial of the motion. The statements were made under the following circumstances:

On September 30, Yeatts requested that Investigator Taylor, with whom he was acquainted, talk with him at the jail. Taylor visited Yeatts about 8:30 p.m., read him the *Miranda* warnings, and secured his signature on a waiver form which stated that Yeatts did not "want a lawyer at this time." After some general

conversation, Taylor asked Yeatts if he had a lawyer. Receiving a negative response, Taylor asked Yeatts whether he wanted a lawyer "here." Yeatts replied, "[m]ight." Taylor again asked Yeatts whether he wanted a lawyer present during their interview. Yeatts replied, "[n]aw. I'm talking to you."

In the course of this first interview, Yeatts, with apparent reference to his earlier "[t]his is b___s___" statement, said he had "lied" to Taylor. Yeatts admitted that on the date in question, he was with Michael Vernon in a car travelling "on some back road," and he volunteered the information that he knew "where [Ms. Dodson's] pocketbook [was] at."

On his own initiative, Taylor returned to the jail about 10:00 p.m. the same evening and told Yeatts he "want[ed] to talk to [him] a little bit about the offense itself." Taylor repeated the *Miranda* warnings and had Yeatts sign another form waiving counsel. In addition, Taylor asked Yeatts if he had an attorney representing him. Yeatts said he had "[n]o attorney at all" and agreed to talk to Taylor.

In this second interview, Yeatts told Taylor that he and Vernon went to Ms. Dodson's home and parked the car. Yeatts claimed to know very little about what transpired. He remembered that Vernon asked Ms. Dodson if she had "any toilet paper" and that he saw Vernon holding a pocketbook, which he handed to Yeatts. The two then drove to a riverbank, where Vernon took some money from the pocketbook, gave part of it to Yeatts, kept the rest, and threw the pocketbook into the river. When Taylor asked Yeatts whether he saw Vernon kill Ms. Dodson or whether he killed her himself, Yeatts replied in the negative to both inquiries.

The next day, Yeatts again asked to talk to Taylor. Upon Taylor's arrival at the jail, he repeated the reading of the *Miranda* warnings and had Yeatts sign a waiver-of-counsel form. Yeatts said he wanted to tell Taylor that when Vernon got in the car at the Dodson home, he threw a bloody pillowcase onto Yeatts's lap. Yeatts did not know where Vernon "got the pillowcase from" or what he "did with it" afterward. The interview ended with Yeatts promising to "let [Taylor] know" if he could "think of anything else."

The fourth interview took place on the afternoon of October 2, following a request from Yeatts that Taylor "come over and talk to [him]." Taylor knew Yeatts had been arraigned that morning and had asked the court to appoint counsel to represent him. After

Taylor received Yeatts's request for an interview, he checked with the court and was unable to ascertain whether anyone had been appointed.

Accompanied by Investigator Vernon Oakes, Taylor visited Yeatts at the jail. Once again, Taylor gave Yeatts the *Miranda* warnings and had him sign the form waiving counsel. Taylor then asked Yeatts whether he had been "before the Judge" that day. Yeatts answered in the affirmative, but did not know whether an attorney had yet been appointed. He said he expected to be "getting an attorney" later on that day or the next. When asked whether he wanted to talk to the two investigators "without calling an attorney" and wanted "to talk to [them] now," Yeatts replied, "[y]es, sir."

In this final interview, Yeatts admitted being at the Dodson home, and he repeatedly told the investigators he was guilty. He said he remembered standing in a room and seeing a woman "[l]aying straight back on the floor" with "some blood . . . on her face," and he "just . . . ran out the door." He also said that he used white shoe polish afterward to cover up blood spots on his shoes. When asked directly whether he "killed the woman," he replied, "[n]o, I didn't . . . I mean yeah, I did." He denied, however, that he stabbed Ms. Dodson or "cut her throat." Then, in response to a question whether he intended to kill Ms. Dodson or whether "things just [got] out of hand," he said, "[y]eah, it just got out of hand and it happened." At the conclusion of the interview, Yeatts asked the investigators for their "handshake."

At the suppression hearing, Yeatts presented the testimony of Robert Stanley Brown, Sr., a psychiatrist. Dr. Brown had examined Yeatts, who was 29 years old at the time, pursuant to court order. Dr. Brown testified that Yeatts was mildly mentally retarded, with a full scale I.Q. of 70 and a mental age of 12 or 13. The doctor also testified he had learned that Yeatts had "stayed drunk," used marijuana, and been unable to sleep in the week before he was arrested.[4] Based upon Yeatts's mental retardation and his stressful situation in the week before arrest, Dr. Brown opined that Yeatts's "ability to understand his rights or his ability to communicate with Officer Taylor concerning his rights at that time [was] compromised."

---

[4] According to the doctor, this information came from Yeatts, Yeatts's girlfriend, and Yeatts's parents.

Yeatts argues that all his statements were involuntary because he is a mentally deficient person and, at the time he made the statements, was also suffering from stress induced by drug abuse, alcohol consumption, and loss of sleep. With respect to the fourth statement, Yeatts makes the additional complaint that he was improperly questioned by police after he had invoked his right to counsel.

We disagree with Yeatts. In *Gray, supra*, we said:

A defendant's waiver of his *Miranda* rights is valid only if the waiver is made knowingly, voluntarily and intelligently. *Miranda*, 384 U.S. at 475. Whether a statement is voluntary is ultimately a legal rather than factual question. *See Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 450 (1985). Subsidiary factual questions, however, are entitled to a presumption of correctness. *Id.* at 112, 106 S.Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether a defendant's will has been overborne, courts look to "the totality of all the surrounding circumstances," *id.* at 226, including the defendant's background and experience and the conduct of the police, *Correll v. Commonwealth*, 232 Va. 454, 464, 352 S.E.2d 352, 357 (1987); *Stockton*, 227 Va. at 140, 314 S.E.2d at 381.

233 Va. at 324, 356 S.E.2d at 163.

We considered similar factual situations in *Correll* and in *Williams v. Commonwealth*, 234 Va. 168, 360 S.E.2d 361 (1987), *cert. denied*, 484 U.S. 1020 (1988). Both cases involved convictions for capital murder and sentences of death.

In *Correll*, on the question whether a waiver of counsel was knowingly and intelligently given, we said:

Despite his low IQ of 68, Correll had on a number of prior occasions dealt with the police and received *Miranda* warnings. He was capable of effecting a valid waiver. *See Simpson v. Commonwealth*, 227 Va. 557, 564, 318 S.E.2d 386, 390 (1984) (defendant with IQ of 78 but with good "street

sense" was capable of understanding his rights and intelligently waiving them); *see also United States* v. *Glover*, 596 F.2d 857, 866 (9th Cir.), *cert. denied*, 444 U.S. 860 (1979) (waiver valid because of defendant's prior experience with police even though his IQ of 67 was in bottom one percentile of society); *People* v. *Williams*, 62 N.Y.2d 285, 288-89, 465 N.E.2d 327, 328-29, 476 N.Y.S.2d 788, 789-90 (1984) (defendant who understood immediate import of *Miranda* warnings but who was unable, due to mental and physical disabilities, to understand the full legal implications of confessing could nonetheless make an effective waiver).

232 Va. at 464, 352 S.E.2d at 358.

In *Williams*, the accused moved to suppress incriminating statements, contending that "at the time he gave them he was emotionally confused, under duress, and not competent to give an accurate statement and thus unable knowingly and intelligently to waive his constitutional rights." 234 Va. at 172, 360 S.E.2d at 364. We upheld the trial court's denial of the motion to suppress, saying the denial was supported by evidence that the accused, although of "low intelligence," had "a good understanding of court procedures and was capable of understanding his rights and making a knowing and voluntary waiver of them." *Id.* at 173, 360 S.E.2d at 364.

Here, at the time Yeatts made the statements in question, he claims to have been suffering both from low intelligence and from stress induced by drugs, alcohol, and loss of sleep, as a result of which, according to Dr. Brown, Yeatts's ability to understand was "compromised." But the doctor's explanation of what he meant by "compromised" was circular at best, leaving the impression that Yeatts merely had "less understanding than the average person."

■ Furthermore, Dr. Brown acknowledged Yeatts had "repeatedly been through the Court system" and "understands what's going on with the system." More important, Dr. Brown conceded Yeatts "had the capacity" to understand "there was a lawyer available to him" when he made the statements, and that is the critical consideration in determining whether his waiver of counsel was knowing and voluntary.

■ In addition, the tapes of the four interviews are included in the record on appeal, and they furnish concrete support for the trial court's finding of voluntariness. The tapes display the care

and thoroughness with which the right to counsel was repeatedly explained to Yeatts, his understanding of his right to have counsel present during the interviews, and his willingness to waive that right.

Finally, there is Yeatts's contention that, in the fourth interview, he was improperly questioned after he had invoked his right to counsel. A similar contention was made in *Correll*. We noted there that under *Edwards* v. *Arizona*, 451 U.S. 477, 484-85 (1981), an accused who has invoked the right to counsel " 'is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*.' " 232 Va. at 462, 352 S.E.2d at 356. (Emphasis added.)

▮ We held that because Correll had initiated the discussions with the police which led to his confessions and had knowingly and intelligently waived his right to counsel, the waiver was sufficient to withstand constitutional challenge. *Id*. For the same reasons, we make the same holding here.

▮ From an independent examination of " 'the totality of all the surrounding circumstances,' " *Gray*, 233 Va. at 324, 356 S.E.2d at 163, we hold that the four statements in question were "the 'product[s] of an essentially free and unconstrained choice by [their] maker.' " *Id*. Accordingly, we will affirm the trial court's denial of Yeatts's motion to suppress the statements.

### b. Motion to Suppress Physical Evidence.

In a separate pretrial motion, Yeatts sought to suppress certain articles of clothing the police seized from his room in his parents' home. When the motion was argued, the Commonwealth represented to the trial court that none of these articles would be offered in evidence, and the judge said he would delay ruling and allow Yeatts to renew the motion later on. However, the Commonwealth never offered any of the articles into evidence, so the point is moot.

▮ Yeatts also sought to suppress a pair of white tennis shoes which were taken by the police from Yeatts's jail cell with his consent but admitted into evidence over his objection. He assigned error to the admission of the shoes, but he has not discussed the point on brief. Hence, the point is waived. See Rule 5:27(e).

## III.

## GUILT PHASE.

### a. Jury Selection.

*Prospective Jurors Bryant and Vaughan.*

Yeatts assigns error to the trial court's refusal to strike for cause prospective jurors Betty G. Bryant and Betty J. Vaughan. Ms. Bryant is an employee of Pittsylvania County and the daughter of a retired deputy sheriff. She knows on a first-name basis Investigators Michael Taylor and Vernon Oakes, members of the county's Sheriff's Department who participated in the investigation of Ms. Dodson's death.

On voir dire, Ms. Bryant said she had not discussed the case with any of her friends in the Sheriff's Department. She also said she had not formed an opinion about the case and would decide it solely upon what she heard in the courtroom.

Yeatts argues that, as a matter of "common sense," Ms. Bryant's "relationship to the police in general as the daughter of a former deputy sheriff, initially makes her suspect." Her "inability to be impartial became certain," Yeatts asserts, when she admitted "she knew Mike Taylor and Vernon Oakes on a first name basis."

In denying Yeatts's motion to strike Ms. Bryant for cause, the trial judge observed: "[S]he said on two and maybe more occasions that she wouldn't give the testimony of a police officer any more credence just because he was a police officer, and she well understood the law as to the credibility of the witnesses. I thought she made a very good impression as a prospective juror, as being fair and impartial."

Betty Vaughan, also challenged by Yeatts, stated on voir dire that she had been exposed to publicity about a capital murder case recently tried in an adjoining county which resulted in the acquittal of the accused. She was acquainted with the accused in that case, and she indicated her belief in his guilt. She denied, however, that her impressions about the other case would influence her view of Yeatts's guilt or innocence or the penalty he should receive if convicted.

Yeatts argues that Ms. Vaughan was "tainted" by the publicity concerning the other capital murder case. Hence, Yeatts con-

cludes, the trial court abused its discretion when it refused to excuse Ms. Vaughan for cause.

In refusing to excuse Ms. Vaughan, the trial judge said he thought she had been "very honest and forthright" in her answers to questions on voir dire. The judge expressed the view that Ms. Vaughan could be "a fair and impartial juror[,] setting aside anything she might have seen or read."

In *Eaton* v. *Commonwealth*, we said:

> The standard to be applied . . . in determining whether to retain a venireman on the jury panel is whether his answers during *voir dire* . . . indicate . . . something that "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

240 Va. 236, 246, 397 S.E.2d 385, 391 (1990) (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 (1980)).

■ Whether a prospective juror should be excused for cause is a matter resting within the sound discretion of the trial court, and its action in refusing to excuse a particular venireman will not be disturbed on appeal unless the refusal amounts to manifest error. *Stockton*, 241 Va. at 200, 402 S.E.2d at 200. It is obvious the trial court found nothing in the voir dire answers of Ms. Bryant or Ms. Vaughan to indicate that their performance would be impaired if selected as jurors, and we find nothing in the record to show an abuse of discretion amounting to manifest error in the court's refusal to excuse them for cause.

*Prospective Jurors Shelton, Broadnax, Faulkner, Clark, Ferrell, Mills, Gregory, Robertson, and Craft.*

These nine prospective jurors were struck for cause on the motion of the Commonwealth's Attorney because of their opposition to the death penalty. On appeal, Yeatts's entire argument is that "[o]nly a juror who is irrevocably committed to vote against the imposition of the death penalty may be excluded for cause" and that "[t]he Trial Court's determination that these jurors were irrevocably committed against the death penalty was erroneous."

■ We disagree with Yeatts. The record establishes without question that each stricken venireman was irrevocably opposed to imposition of the death penalty and, hence, that his views " 'would

prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Eaton*, 240 Va. at 246, 397 S.E.2d at 391.

■ Yeatts makes the additional point that these nine prospective jurors were black. This is the sum total of his argument on the point: "Clearly, any matter which has the effect of greatly increasing the probability of excluding a racial group is invalid. The absence of a significant number of blacks on the jury which sentenced [Yeatts] to death is constitutionally impermissible."

Yeatts does not claim that any consideration entered into the exclusion of the nine prospective jurors other than their opposition to the death penalty, and the record contains no hint of racial discrimination in their exclusion. Their opposition to the death penalty disqualified them for cause, and the fact they were also black did not make their exclusion constitutionally impermissible. Hence, we reject Yeatts's argument on the point.

### b. Admissibility of Photographs.

Yeatts contends the trial court erred in admitting "graphic photographs" of Ms. Dodson's wounds. He argues the photographs "added nothing to the medical testimony [and] served only to prejudice the jury."

The trial court made a careful examination of the photographs tendered by the Commonwealth. The court rejected several photographs and required that one be altered to show only a wound to Ms. Dodson's neck.

■ "[T]he admission of photographs in evidence rests within the discretion of the trial court." *Quesinberry* v. *Commonwealth*, 241 Va. 364, 378, 402 S.E.2d 218, 226 (1991). "Photographs of a victim are relevant if they tend to show motive, intent, method, premeditation, malice, or the degree of atrociousness of the crime." *Gray*, 233 Va. at 342-43, 356 S.E.2d at 173. The photographs admitted by the trial court were relevant and were accurate portrayals of the scene Yeatts and his accomplice, Vernon, left behind. We find no abuse of discretion in the trial court's admission of the photographs.

### c. Motions for Mistrial.

The question Yeatts presents here stems in part from a response by the Commonwealth to a discovery request made by Yeatts and

in part from an incident involving the testimony of James B. Doss, a deputy sheriff who served as jailer and who was called as a Commonwealth's witness. In one of his discovery requests, Yeatts asked for all the statements he made to police officials. One of the Commonwealth's responses read as follows:

On October 2, 1989 at approximately 2:05 p.m., Yeatts told Deputy Doss that, on the day of the murder, he smoked crack cocaine, Vernon found the house, Vernon asked if the victim had a roll of toilet paper, and said he didn't remember anything else due to drug consumption. Other non-pertinent matters were discussed.

On direct examination, Doss testified that after Yeatts and Vernon were arraigned on October 2, 1989, he overheard Yeatts tell Vernon "he didn't mean to kill [Ms. Dodson]." On cross-examination, defense counsel asked Doss if Yeatts later on said he "didn't remember anything that happened." Doss replied, "[n]ot that day, no, sir." When counsel remarked, "[w]ell, at some time he told you that he didn't remember anything," Doss said, "[y]es sir."

On redirect, the prosecutor asked Doss, "[d]o you recall on this later conversation what Mr. Yeatts said he did remember?" Upon receiving Doss's affirmative response, the prosecutor asked, "[o]kay, what was that?" Doss replied, "Mr. Yeatts spoke of his prior convictions and his drug abuse."[5]

Defense counsel said, "[y]our Honor, I object," and the trial judge sustained the objection. The prosecutor proceeded without objection to ask Doss several other questions about his conversation with Yeatts, the last of which elicited the response that "Vernon apparently drove by [Ms. Dodson's] house . . . and he yelled out, that's where the old bitch lives." Defense counsel then told the court he had "a motion to make," and the court sent the jury from the courtroom.

---

[5] This later conversation between Doss and Yeatts actually took place on October 3, 1989, not October 2, as the Commonwealth's response to discovery indicated. On October 3, Doss escorted Yeatts to the recreation area on the roof of the jail. Doss testified he did not ask Yeatts any questions or make any statements that would encourage him "to begin this type of discussion or any kind of discussion at all." Doss testified further that Yeatts "began talking about his life in general," that the first aspect he began to talk about was "[h]is prior convictions and his drug abuse," and that he "just voluntarily began talking about [what occurred on September 23, 1989, the offense date]."

Defense counsel stated to the court that he had "two things" to raise, first, a motion for a mistrial "on [the] basis" that Doss's reference to "prior crimes" was improper and, second, an objection that the Commonwealth's response to Yeatts's discovery request did not include the statement made to Doss about "prior crimes."

The matter was discussed by the trial judge and counsel. The judge took the motion for mistrial under advisement and asked counsel for authority on two points, one, whether the prosecutor's question which elicited Doss's "prior crimes" response was "legitimate" in view of Yeatts's cross-examination and, two, whether Yeatts had delayed unduly in moving for a mistrial.

With respect to Yeatts's discovery objection, the trial judge read to the jury the Commonwealth's full discovery response. In the judge's words, this action was to serve as a "sanctioning correction for not making the full disclosure" and to contradict "what the Deputy said." We approved similar curative action in *James Dyral Briley* v. *Commonwealth*, 221 Va. 563, 576, 273 S.E.2d 57, 65 (1980).

Yeatts voiced no objection to the trial court's disposition of his discovery objection. The next day, however, he moved for a mistrial on the ground "[t]he discovery response that [he] received [was] not adequate." After hearing argument on this and Yeatts's earlier mistrial motion, the trial court refused to declare a mistrial.

We do not think the trial court erred in denying Yeatts's motions for mistrial. We have repeatedly held that if a defendant wishes to take advantage on appeal of some incident he regards as objectionable enough to warrant a mistrial, he must make his motion timely or else be deemed to have waived his objection. *Russo* v. *Commonwealth*, 207 Va. 251, 257, 148 S.E.2d 820, 825 (1966), *cert. denied*, 386 U.S. 909 (1967); *see also Cheng* v. *Commonwealth*, 240 Va. 26, 38-39, 393 S.E.2d 599, 605-06 (1990); *Price* v. *Commonwealth*, 213 Va. 113, 121, 189 S.E.2d 324, 330 (1972); *Brown* v. *Commonwealth*, 208 Va. 512, 518-19, 158 S.E.2d 663, 668-69 (1968). Making a timely motion for mistrial means making the motion "when the objectionable words were spoken." *Reid* v. *Baumgardner*, 217 Va. 769, 774, 232 S.E.2d 778, 781 (1977). Both of Yeatts's motions for mistrial fail the test of timeliness and were properly denied.

On a related point, Yeatts argues the trial court erred in admitting into evidence a portion of the tape of the fourth statement he made to the police. In the challenged portion, Yeatts said: "Well, . . . for my record I'll never see the street no more no way."

■ Yeatts says that this was improper evidence of prior criminal offenses and that the trial court's refusal to delete the objectionable portion constitutes reversible error. We do not agree. While there is some question whether the jury was permitted to consider Yeatts's remark about his record, we think there was no error even if the jury was permitted to consider it. The remark was volunteered by Yeatts, unresponsive to any question. It was an "integral [part] of a confession we have found to be voluntary, [and was] competent evidence." *Mu'Min* v. *Commonwealth*, 239 Va. 433, 446, 389 S.E.2d 886, 895 (1990), *aff'd*, 500 U.S. ____, 111 S.Ct. 1899 (1991).

### d. Sufficiency of Evidence of Robbery.

Yeatts contends the trial court erred in refusing to strike the evidence with respect to robbery. He argues that the Commonwealth failed to prove that force was used prior to or contemporaneously with the taking of Ms. Dodson's money and that the "most the Commonwealth has proven was that the taking, if any, took place afterwards."

■ We agree with Yeatts that the Commonwealth had the burden of proving a " 'taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.' " *Quesinberry*, 241 Va. at 373, 402 S.E.2d at 224, quoting *Hoke* v. *Commonwealth*, 237 Va. 303, 310, 377 S.E.2d 595, 599, *cert. denied*, 491 U.S. 910 (1989). We do not agree, however, that the Commonwealth failed to meet its burden. We think that Ms. Dodson's murder was "closely related in point of time, place, and causal connection" to the robbery, *Haskell* v. *Commonwealth*, 218 Va.1033, 1041, 243 S.E.2d 477, 482 (1978), and that the evidence was sufficient, therefore, to support a conclusion "the killing and theft were interdependent objects of a common criminal design." *Quesinberry*, 241 Va. at 374, 402 S.E.2d at 224.

*Branch* v. *Commonwealth*, 225 Va. 91, 300 S.E.2d 758 (1983), cited by Yeatts, is inapposite. There, we reversed a robbery conviction, but the evidence negated any inference the accused intended to rob his victim at the time he shot him. We said that

"the violent killing and the unlawful taking were two separate acts, performed for entirely different reasons." 225 Va. at 95, 300 S.E.2d at 760.

## IV.

## PENALTY PHASE.

### a. Admissibility of Post-Sentence Psychiatric Report.

Yeatts contends the trial court, in determining whether to impose the sentence of death, erroneously considered the report of Dr. Arthur Centor, a forensic clinical psychologist at Central State Hospital. Dr. Centor examined Yeatts pursuant to court order and reported Yeatts posed "a probability of future dangerousness." Yeatts argues that the report was not entitled to consideration because it equated dangerousness with low intelligence, a standard, Yeatts asserts, which "has long been constitutionally impermissible."

We need not decide whether Yeatts properly characterizes Dr. Centor's report as equating dangerousness with low intelligence. The record shows that the report was admitted into evidence without objection. Hence, we will not consider Yeatts's argument. Rule 5:25.

### b. Sufficiency of Proof of Future Dangerousness.

Under Code § 19.2-264.2, the death penalty may not be imposed unless the court or jury shall find one or both of two aggravating factors we have termed "future dangerousness" and "vileness" in our opinions. Here, the jury found only "future dangerousness," meaning "there is a probability that [Yeatts] would commit criminal acts of violence that would constitute a continuing serious threat to society." *Id.*

Yeatts argues that the Commonwealth failed to produce sufficient proof of his "future dangerousness." He says that his "prior convictions with the exception of assault and battery on a jail inmate were convictions of a non-violent nature" and that the unadjudicated claim he raped his sister-in-law is "beyond belief."

We do not agree with Yeatts that, with the exception of the assault and battery charge, his prior convictions are all for of-

fenses of a nonviolent nature.[6] He has a total of ten felony convictions. Of these ten, at least one was for burglarizing a dwelling house.[7]

"[A]t common law, [burglary was] primarily an offense against the security of the habitation, and that is still the general conception of it." *Compton* v. *Commonwealth*, 190 Va. 48, 55, 55 S.E.2d 446, 449 (1949). " 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation — the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence.' " *Rash* v. *Commonwealth*, 9 Va. App. 22, 25, 383 S.E.2d 749, 751 (1989) (quoting *People* v. *Statler*, 174 Cal. App.3d 46, 54, 219 Cal. Rptr. 713, 718 (1985)).

Further, two of Yeatts's felony convictions are for burglarizing churches. Under *Compton*, the burglary of a church cannot be said to constitute an offense against the security of habitation. Under *Rash*, however, such a burglary certainly would pose a threat to the personal safety of those who happen to be present in the church when a burglar enters or who happen to enter while a burglary is in progress.

Hence, counting the one conviction for assault and battery on a jail inmate, the one burglary conviction involving a dwelling, and the two burglary convictions involving churches, Yeatts has at least four convictions of violent or potentially violent crime. In addition, he has a felony conviction for consensual sodomy, four felony convictions for grand larceny, and misdemeanor convictions for petit larceny, trespassing, nonsupport, and contempt of court.

From the time of his first felony conviction in 1980, when he was 19 years old, until four days before the Dodson murder in September 1989, Yeatts remained incarcerated or on probation or parole.[8] All but one of the felony offenses of which he was con-

---

[6] It should not be assumed that, because we demonstrate Yeatts has prior convictions for other violent offenses, we consider his conviction for assault and battery insufficient, standing alone, to support a finding of "future dangerousness."

[7] Yeatts has a total of five burglary convictions. One involves a dwelling, *see* text, *supra*, two involve churches, *see* text, *infra*, and one involves a building at a livestock market. It is unclear whether the fifth conviction involves a dwelling or some other type of building.

[8] Yeatts was released from supervision four days before Ms. Dodson's murder, but he had not been notified of his release at the time of the murder.

victed were committed while he was under the supervision of probation or parole authorities.

In addition to his record of crime, Yeatts had a history of unadjudicated misconduct. A sister-in-law, Debbie Yeatts, testified that Yeatts had assaulted and raped her in June 1988.[9] A friend, Kenneth Pritchett, testified that Yeatts urged him to rape Debbie on the same occasion but that he desisted when she objected. Yeatts's mother testified that she was forced to call the police when he threatened his father. A neighbor, John Cain, testified that Yeatts, from jail, wrote him a threatening letter, part of the record on appeal, ordering him to stay away from Yeatts's girlfriend, Brenda Dalton.

█ Finally, the circumstances relating to the commission of the murder itself are reflective of a high degree of violence in the attack upon Ms. Dodson. Her death resulted from a "large incised wound of the right neck, with . . . extensive bleeding from the carotid artery and jugular vein." The victim suffered at least twelve other stab wounds to the face, neck, and chest. The savagery of the attack was unnecessary to the accomplishment of the robbery and to the silencing of Ms. Dodson as a witness, which, as Yeatts admitted to Vernon, was the motive for her murder because "she seen [Yeatts's] face." We think the evidence amply supports the jury's finding of "future dangerousness."

## V.

## SENTENCE REVIEW.

Under Code § 17-110.1(C)(1) and (2), we are required to consider and determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor" and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

### a. Passion and Prejudice.

Yeatts contends his sentence of death was the product of passion and prejudice because, in the first phase of the trial, the jury

---

[9] As noted in the text, *supra*, Yeatts claims that Debbie Yeatts's testimony concerning the rape was "beyond belief." Her testimony was corroborated, at least in part, by Yeatts's friend, Kenneth Pritchett, but, in any event, the question of Debbie's credibility was for the jury.

fixed his punishment for robbery at only 20 years but then, upon hearing the evidence of his unadjudicated misconduct, fixed his punishment for murder at death. His criminal record contains "no crimes of violence," Yeatts asserts, and the only evidence presented to the jury concerning any crime of violence was the testimony concerning the alleged rape of his sister-in-law, which was an unadjudicated offense. Hence, Yeatts suggests, the evidence of the unadjudicated rape offense must have inflamed the jury and caused it to act out of passion in fixing his punishment at death.

■ We disagree with Yeatts. In the first place, we attach no significance to the fact that the robbery sentence was no greater than 20 years. Second, as we demonstrated in the preceding section, Yeatts's criminal record does contain convictions for crimes of violence. Finally, nothing supports the notion that the evidence of the unadjudicated rape offense, or anything else appearing in the record, inflamed the jury and caused it to act out of passion in fixing Yeatts's punishment at death.

### b. Proportionality.

The test of proportionality is whether juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes. *Stamper*, 220 Va. at 284, 257 S.E.2d at 824. Yeatts contends that the "jury verdict of death [in this case] is excessive and disproportionate to sentences generally imposed by other sentencing bodies in the Commonwealth for comparable or similar cases and must be set aside." Yeatts argues that his participation in the death of Ms. Dodson "does not rise to the level of culpability requisite for a sentence of death." In addition, Yeatts says that his mental retardation is a factor to be considered. Finally, Yeatts maintains that the summary of cases contained in *Spencer v. Commonwealth*, 238 Va. 295, 384 S.E.2d 785 (1989), *cert. denied*, 493 U.S. 1093 (1990) (*Spencer II*), "indicates that the death penalty is appropriate only when both future dangerousness and vileness are found to exist," and here the jury "found only the future dangerousness predicate and not the vileness predicate."

■ Considering this last point first, we find nothing in the summary of cases contained in *Spencer II* which even remotely suggests that the death penalty is appropriate only where both the "future dangerousness" and "vileness" predicates are found to exist. The jury in *Spencer II* found the existence of both predicates,

and, in determining whether Spencer's death sentence was excessive or disproportionate to sentences generally imposed by other sentencing bodies in Virginia, we examined, in accordance with Code § 17-110.1(C)(2), "the penalty imposed in similar cases," meaning capital murder cases with similar underlying felonies where both predicates were found to exist.

■ Here, the jury found the existence of only the "future dangerousness" predicate. In making our proportionality determination, therefore, we will consider other capital murder cases where robbery was the underlying felony and the death penalty was based upon only the "future dangerousness" predicate. *See Savino v. Commonwealth*, 239 Va. 534, 391 S.E.2d 276, *cert. denied*, ____ U.S. ____, 111 S.Ct. 229 (1990); *Mackall v. Commonwealth*, 236 Va. 240, 372 S.E.2d 759 (1988), *cert. denied*, 492 U.S. 925 (1989); *Townes v. Commonwealth*, 234 Va. 307, 362 S.E.2d 650 (1987), *cert. denied*, 485 U.S. 971 (1988); *Williams v. Commonwealth*, 234 Va. 168, 360 S.E.2d 361 (1987), *cert. denied*, 484 U.S. 1020 (1988); *Pope v. Commonwealth*, 234 Va. 114, 360 S.E.2d 352 (1987), *cert. denied*, 485 U.S. 1015 (1988); *Poyner v. Commonwealth*, 229 Va. 401, 329 S.E.2d 815, *cert. denied*, 474 U.S. 865 (1985) (Williamsburg and Newport News cases); *Peterson v. Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983); *Bassett v. Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982).

We have also examined capital murder cases where robbery was the underlying felony and the penalty imposed was imprisonment for life, including *Palmer v. Commonwealth*, 143 Va. 592, 130 S.E. 398 (1925), cited by Yeatts. We are satisfied from our examination that, while there are exceptions, *e.g.*, *Palmer*, juries in this jurisdiction *generally* impose the death sentence for crimes comparable or similar to Yeatts's murder of Ms. Dodson.

This leaves the question of Yeatts's mental retardation. The entirety of his argument on the subject is contained in this sentence in his brief: "[Yeatts's] mental retardation is a critical factor that the Court must consider. Va. Code §19.2-264.4(B)(vi)."

■ Code § 19.2-264.4(B) states that "[f]acts in mitigation may include, but shall not be limited to" six items, the last of which is the "mental retardation of the defendant." The jury heard the testimony of Yeatts's psychiatrist, Dr. Brown, and also had the benefit of the doctor's written report. The jury was in-

structed that it should "consider any evidence introduced, in mitigation of the offense, in determining the proper sentence in this case."

We will assume the jury followed the court's instruction and considered the evidence concerning Yeatts's mental retardation. It is obvious the jury found that Yeatts's mental condition did not mitigate the offense. Yeatts has offered no reason why we should disturb that finding, and we perceive none.

Finding no error in the record and no basis to set aside the death sentence, we will affirm the trial court's judgments.

*Affirmed.*