# CARL HAMILTON CHICHESTER

## V.

# COMMONWEALTH OF VIRGINIA

Record Nos. 940130 and 940131

September 16, 1994

Present: All the Justices

*R. Randolph Willoughby; Bryant A. Webb* for appellant.

*Katherine P. Baldwin, Assistant Attorney General (James S. Gilmore, III, Attorney General*, on brief), for appellant.

JUSTICE WHITING delivered the opinion of the Court.

On March 1, 1993, Carl Hamilton Chichester was indicted for (1) the capital murder of Timothy A. Rigney, (2) the robbery of Rigney, (3) the use of a firearm in the commission of Rigney's murder, and (4) the use of a firearm during Rigney's robbery.

In the first stage of a bifurcated trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Chichester of all four charges and fixed his punishment at imprisonment for the following terms: life for the second charge; two years for the third charge; and four years for the fourth charge. In the second stage of the capital murder trial, the jury fixed his punishment at death based on a finding of "future dangerousness."

After the jury returned its verdicts, the court found Chichester guilty of the four offenses and referred the cases to the probation officer of the court "to thoroughly investigate and report to the Court on December 2, 1993." After considering the probation officer's report covering all four charges, the court imposed the sentences fixed by the jury.

Chichester is before this Court for automatic review of his death sentence, Code § 17-110.1(A), and we have consolidated that review with the appeal from his capital murder conviction. We have also certified Chichester's appeal of his robbery and firearm convictions from the Court of Appeals. Code § 17-116.06. Pursuant to Code § 17-110.1(F), we have consolidated those appeals with our automatic review of the sentence of death.

## I. EVIDENCE

Since the Commonwealth prevailed in the trial court, we state the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth. *Mueller v. Commonwealth*, 244 Va. 386, 390, 422 S.E.2d 380, 383 (1992), *cert. denied*, 507 U.S. ____, 113 S.Ct. 1880 (1993); *Cheng v. Commonwealth*, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990).

Near 10:30 p.m. on August 16, 1991, just before Little Caesars Pizza Restaurant (Little Caesars) in the Manaport Shopping Center in Manassas was to close, two black men wearing dark clothing, "home-made" masks, and gloves entered the restaurant.

One man was about three inches taller than the other and both men were armed with semi-automatic pistols.

The shorter man immediately jumped over the service counter, ordered Denise Matney, a restaurant employee, to open one cash register. The shorter man took at least $100 from the register. When Matney was unable to open the second register, the shorter man went into a back room and returned with Rigney, the manager. Although both Matney and Rigney tried to open the register, they were unable to do so. When Rigney indicated that they could not open the register, the taller man, who was standing in front of the counter, shot Rigney in the left upper chest. The bullet pierced a major artery of Rigney's heart, causing him to bleed to death.

After shooting Rigney, the taller man bent down and retrieved the ejected cartridge case from the floor. Both men then ran from Little Caesars toward the rear of the shopping center.

On the night of Rigney's murder, no one at the scene could identify the two men. However, shortly after the murder, Detective William Van Cuyk canvassed the neighborhood for possible witnesses. In doing so, Van Cuyk ascertained from Jack Gill Burdette, Jr., who was walking behind the Manaport Shopping Center between the hours of 10:00 and 11:00 on the night of Rigney's murder, that Burdette had seen two men running in the rear of the shopping center from the area of Little Caesars "dressed in practically black." On February 18, 1993, Burdette told Van Cuyk that he had recognized one of the two men as Chichester, a person with whom he had had "dealings." Burdette testified that in his first interview he had not told Van Cuyk that he had recognized Chichester because he was concerned about the safety of his family.

The bullet that killed Rigney was examined by Julian J. Mason, Jr., a forensic scientist specializing in firearms identification. Mason testified that it was a "Winchester Western brand 380 auto, silver tip hollow-point bullet." The police also took an impression of a latent shoe print left on the counter by the shorter man's right shoe. That print was later processed by Robert B. Hallett, a forensic scientist specializing in the examination and comparison of shoe print impressions left at crime scenes. The police then furnished Hallett with a pair of shoes they had seized from the home of Shelton McDowell, a suspect in the robbery. Hallett compared the design, size, and evidence of wear "according to the manner-

ism of the principal wearer of that shoe," and a particular "identifying" small cut in the shoe. Hallett identified the right shoe of the pair seized from McDowell's home as the shoe that made the shoe print on the counter.

Police also suspected that McDowell and Chichester were the two armed, masked black men involved in the robbery of employees of Joe's Pizza, another pizza restaurant in the Manassas area, just before it closed the night of August 7, nine days before Rigney's murder.

No one at the scene of the August 7 crime could identify either man. However, Rebecca Sue Hamilton, an employee of Joe's Pizza who had been working during an earlier shift that day, but who was not present at the robbery, identified both men from a photographic spread. Their photographs indicated that they were black. Hamilton testified that Chichester entered the restaurant in the afternoon before the robbery, used the rest room, asked when the restaurant closed, took a menu, and left. Hamilton further testified that less than 30 minutes later, McDowell entered the restaurant, used the rest room, and left.

Near 10:30 p.m. on August 7, two armed and masked black men entered Joe's Pizza just before closing time. One man was taller than the other. Mark Thomas Walls, then 16 years old, was working at Joe's Pizza and had his back to the customer area. Walls became aware of the entry when the taller man put his hand on his shoulder. When Walls pushed him, the man "said something like, 'You think I'm joking with you'. . . . Then he pulled out a gun."

The taller man grabbed Walls by the hair on the back of his head and held the gun to his head. As Walls saw the man start to pull the trigger, Walls jerked his head and the bullet missed him. The taller man then retrieved the ejected cartridge casing from the floor. However, on the way out, he apparently dropped the casing because Hamilton found it under a counter several days later and gave it to the police.

The police later recovered the spent bullet from the wall of a nearby building. Mason compared that bullet and the cartridge casing with the bullet and casing from his test firing of a nine millimeter semi-automatic pistol which police seized on December 12, 1991, from a motel room occupied by Chichester and Mercedes Brown, Chichester's girl friend. Mason opined that this pistol had fired the bullet from the casing found at Joe's Pizza.

Brown, who had lived with Chichester in three different Manassas area motels from October to December 1991, testified that Chichester kept the nine millimeter pistol in the room, and that sometimes he took it with him when he left the room. On one occasion, when police came to the motel room looking for a juvenile, Chichester threw the pistol out the window. After the police left, at Chichester's request, Brown retrieved it. After the police had seized his nine millimeter pistol on December 12, Chichester told Brown that they had taken "one of his best guns."

Christopher Jose McLean stayed with Chichester and Brown in one of the motel rooms for one or two weeks in November and December 1991. McLean testified that the gun the police had seized from Chichester's motel room appeared to be the same gun he had seen in the motel room and in Chichester's car. When Chichester discovered that the police had seized the pistol, he told McLean, "They got my baby."

At some time in November or December of 1991, Chichester asked Richard Fairfax to sell a gun for him. Fairfax agreed to do so, and they drove to McDowell's house some time after midnight. McDowell was standing outside when they arrived and Fairfax heard Chichester tell McDowell that, "[W]e was going to take care of this." Chichester got out of the car, walked away from it with McDowell, and had a further conversation out of Fairfax's hearing.

Fairfax and Chichester then went to Maryland, where Fairfax knew he could sell the gun. As they were proceeding on the Capital Beltway, a police officer overtook them with his cruiser's blue lights flashing. After the cruiser passed them, Chichester told Fairfax that "he would have to do [the officer]" if the officer stopped them because "he had a body on the gun."

Although Fairfax testified that Chichester and the man who bought the gun in Maryland referred to it as a nine millimeter gun, Fairfax said that the gun he sold did not look like the nine millimeter gun that was seized from Chichester and shown to Fairfax during his testimony. Fairfax testified the seized nine millimeter gun looked "somewhat" like another gun he had seen in Chichester's car during the trip. Mason testified that because of similarities in appearance, 380 semi-automatic pistols are often mistakenly referred to as nine millimeter semi-automatic pistols.

When he was arrested on January 7, 1992, Chichester told Detective Clifford R. Sowards that he did not know McDowell.

However, other testimony established a close relationship between the two men. Chichester's mother testified that McDowell and her son were friends. Barbara Schoelles, the manager of an apartment complex in Prince William County, testified that Chichester, McDowell, and Tamara Brooks were all listed as occupants on a one-year apartment lease beginning November 1, 1989. Schoelles also testified that she had heard that Chichester lived there.

Brown testified that McDowell came to the motel room she and Chichester were occupying two to three times a week, that they frequently went into the bathroom and talked "privately," and that the two men occasionally had left the motel room together. Brown also testified that both men had pagers and that she had heard Chichester returning McDowell's pager calls.

Franklin Alexander Binnaman, who was married to Chichester's first cousin, testified that McDowell and Chichester had stopped at his house "once in a while" and that they played ball together. On August 1, 1991, Chichester and McDowell were together and borrowed dark-colored sweat shirts from Binnaman.

Beginning on January 8, 1992, the day following Chichester's arrest, and extending through March 22, 17 collect telephone calls were made to McDowell's unpublished home telephone number from the cell block Chichester occupied with 7 or 8 other persons. Those telephone calls lasted for a total of over seven hours.

When arrested by Sowards, Chichester denied ever being in Joe's Pizza or robbing the restaurant employees. However, Sowards testified that he later heard Chichester admit that he committed the offenses at Joe's Pizza.

Three weeks prior to Chichester's arrest, while executing a search warrant for the nine millimeter gun, Officer Deborah Twomey noticed a pair of dark cotton gloves in Chichester's motel room. Thereafter, when Chichester was arrested, Twomey executed search warrants for his motel room and the car he usually drove. Among the articles she discovered in the car were a pager, a dark-colored nylon stocking mask, and five Remington 380 caliber cartridges. Among the items discovered in his motel room were a black, hooded sweat shirt and a black long-sleeved turtleneck shirt.

Although Chichester's mother testified that she had employed him on a part-time basis cleaning office buildings in the Washington, D.C. area, Chichester told Sowards that he had not been employed since his discharge from the Marine Corps in 1988. Addi-

tionally, Mrs. Chichester produced a calendar which she said indicated that Chichester worked for her on the evening of Rigney's murder. However, neither Mrs. Chichester nor her daughter, Vivian, who would have been working with Chichester on that evening, had any independent recollection that he did work on the evening of Rigney's murder.

## II. ISSUES PREVIOUSLY DECIDED

■ Chichester raises several legal issues that we have previously decided adversely to his contentions. Chichester advances no persuasive reasons to modify our previous conclusions, and we perceive none. Accordingly, we adhere to our previous rejections of those contentions and will not discuss them beyond citing representative cases in which the contentions have been expressly rejected. These contentions are:

A. The death penalty is cruel and unusual punishment in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, § 8 of the Virginia Constitution. Rejected in *Satcher v. Commonwealth*, 244 Va. 220, 227-28, 421 S.E.2d 821, 826 (1992), *cert. denied*, ____ U.S. ____, 113 S.Ct. 1319 (1993).

B. The provision for death by electrocution is cruel and unusual punishment in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, § 8 of the Virginia Constitution. Rejected in *Ramdass v. Commonwealth*, 246 Va. 413, 419, 437 S.E.2d 566, 569 (1993), *vacated on other grounds and remanded*, ____ U.S. ____, ____ S.Ct. ____ (1994); *Poyner v. Commonwealth*, Order entered in Record No. 930301 on March 10, 1993; *Stockton v. Commonwealth*, 241 Va. 192, 215, 402 S.E.2d 196, 209-10, *cert. denied*, 502 U.S. 902 (1991); and *Martin v. Commonwealth*, 221 Va. 436, 439, 271 S.E.2d 123, 125 (1980).

C. The trial court should have granted an evidentiary hearing on the issue of whether death by electrocution is cruel and unusual punishment. Rejected in *Poyner v. Commonwealth*, Order entered in Record No. 930301 on March 10, 1993.

D. The trial court should have permitted individual and sequestered *voir dire* examination of the prospective jurors. Rejected in *Swann v. Commonwealth*, 247 Va. 222, 228, 441 S.E.2d 195, 200 (1994); *Stewart v. Commonwealth*, 245 Va. 222, 229, 427 S.E.2d 394, 399, *cert. denied*, 510 U.S. ____, 114 S.Ct. 143 (1993); and

*Fisher v. Commonwealth*, 236 Va. 403, 410-11, 374 S.E.2d 46, 50 (1988), *cert. denied*, 490 U.S. 1028 (1989).

E. The trial court should have permitted Chichester to make additional peremptory challenges of prospective jurors. Rejected in *Swann*, 247 Va. at 227-28, 441 S.E.2d at 199-200; *Beavers v. Commonwealth*, 245 Va. 268, 273, 427 S.E.2d 411, 416, *cert. denied*, ____ U.S. ____, 114 S.Ct. 171 (1993).

F. The trial court's failure to provide investigative assistance at state expense violated Chichester's Fourteenth Amendment Due Process rights. Rejected in *Ramdass*, 246 Va. at 418, 437 S.E.2d at 569.

### III. ISSUES PROCEDURALLY DEFAULTED

■ Rule 5:25 provides:

> Error will not be sustained to any ruling of the trial court . . . before which the case was initially tried unless the objection was stated with reasonable certainty at the time of the ruling.

Since Chichester did not object to the trial court's rulings when they were made, we will not consider assignments of error 20 (exclusion of prospective juror Roger Pearce), 22 (sequestration of jury), and 26 (alleged prejudice of jury).

### IV. PRETRIAL MOTIONS FOR CONTINUANCE AND INVESTIGATOR

Chichester, an indigent, complains of the trial court's denial of his motions to continue the case and to appoint an investigator at state expense to assist his two lawyers in finding two witnesses who might have provided exculpatory evidence.

■ The trial court's ruling on both requests is a matter within its sound discretion. *Thomas v. Commonwealth*, 244 Va. 1, 13, 419 S.E.2d 606, 612-13, *cert. denied*, 506 U.S. ____, 113 S.Ct 421 (1992) (continuance motion); *Poyner v. Commonwealth*, 229 Va. 401, 412-13, 329 S.E.2d 815, 824, *cert. denied*, 474 U.S. 888 (1985) (continuance motion); *see Quintana v. Commonwealth*, 224 Va. 127, 135, 295 S.E.2d 643, 646 (1982), *cert. denied*, 460 U.S. 1029 (1983) (appointment of investigator is act of judicial grace not constitutionally required).

We review the record to determine if that discretion has been abused. On April 2, 1993, the court appointed two lawyers to represent Chichester. The court later set the trial date for July 6. On May 14, Chichester's lawyers moved the court to appoint an investigator to assist them in locating and interviewing witnesses. The Commonwealth's Attorney pointed out that McDowell had already been tried and convicted for his roles in both the Joe's Pizza and Little Caesars robberies and that the records in those cases, which were available to defense counsel, contained most of the evidence the Commonwealth would present in this case. Thereafter, the court denied the motion.

On June 11, on Chichester's motion, the court continued the trial from July 6 to September 14 to give the defense more time to interview witnesses and make other trial preparations. Shortly thereafter, without objection, the trial date was changed to September 13.

On July 30, Chichester's counsel again sought the appointment of an investigator for the limited purpose of locating two witnesses who were described in an August 28, 1991 affidavit of Detective Sowards that had been filed in support of a search warrant. In pertinent part, the affidavit stated:

On 8/27/91, I received information from a concerned citizen that the citizen was present when a subject identified as Billy Cain, white male, sixteen years of age, made a statement that he and a subject known as "L.A." went into Little Caesar's Pizza Shoppe and that he, Billy Cain, shot the man because he thought he was "going for a gun". Through my investigation of police department and juvenile court records, I have learned the subject known as "L.A." has a real name of Nathanial Dixon, black male, sixteen years of age. According to those records, Mr. Dixon resides at 7687 Callan Drive, Manassas, Virginia.

Although Chichester's counsel had talked to Sowards about the affidavit, they did not ask him what his informant said about the circumstances under which Cain's alleged statement was made.

Chichester's counsel indicated to the court that they had been unable to find either Cain or Dixon and requested the assistance of an investigator in trying to locate them. The Commonwealth noted that there was no reason to believe that a private investiga-

tor could do any more than the police investigators had done in trying to locate either of the parties named in the affidavit. Concluding that Chichester had not sufficiently shown the need for an investigator, the court denied Chichester's motion.

On September 10, Chichester's counsel asked the court to reconsider its ruling on their motion for the appointment of an investigator, and also moved that the trial be continued a second time in order to give defense counsel additional time to attempt to locate Cain and Dixon. Opposing both motions, the Commonwealth pointed out that Sowards's affidavit was filed in support of one of a number of investigative leads which were found to be groundless, and that the Commonwealth was obliged to disclose any exculpatory information to Chichester in the event that it had discovered any. The court denied both motions.

Chichester contends that the trial court should have granted his motion for a continuance "to enable [Cain and Dixon] to be found." Considering that neither the police nor Chichester's counsel had been able to locate either Cain or Dixon in the extended periods before the trial, it is doubtful that they could have been located even with the assistance of an investigator during the additional period of any continuance. And it is also unlikely that, if located and present at trial, either Cain or Dixon would have admitted that they, rather than Chichester and McDowell, had committed the Little Caesars crimes.

■ The burden is on the party seeking a continuance to show that it is likely that the witness would be present at a later date, *Piccolo v. Woodford*, 184 Va. 432, 440, 35 S.E.2d 393, 396 (1945), and would testify in the manner indicated in the proffer. *See Stewart v. Commonwealth*, 10 Va. App. 563, 569, 394 S.E.2d 509, 513 (1990) (court denied motion for continuance based on defendant's "speculation" that missing witness might be potentially valuable). Given the circumstances, we find no abuse of discretion in the court's denial of Chichester's motion for a continuance and the appointment of an investigator.

■ Next, Chichester asserts that his Sixth Amendment rights to a fair and impartial trial were violated by the court's failure to appoint an investigator. However, he fails to state in what way the lack of investigative help violated those rights, and he refers to no authority supporting his assertion. Accordingly, we find no merit in this contention.

## V. JURY MATTERS

### A. Commonwealth's Peremptory Strikes

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that purposeful discrimination based upon race in the selection of jurors was a violation of the Equal Protection Clause. Chichester maintains that the Commonwealth engaged in such discrimination by striking two prospective jurors solely because they were members of the black race.

We recently set forth the principles applicable to such challenges as follows:

> The defendant must make a *prima facie* showing that the prosecutor has exercised peremptory strikes on the basis of race. *Powers v. Ohio*, 499 U.S. 400, 409-10 (1991). If this showing is made, the burden shifts to the prosecutor to articulate a racially neutral explanation for striking the jurors in question. *Batson*, 476 U.S. 96-97. If the court determines that the proffered reasons are race-neutral, the defendant should be afforded an opportunity to show why the reasons, even though facially race-neutral, are merely pretextual and that the challenged strikes were based on race. *United States v. Joe*, 928 F.2d 99, 103 (4th Cir. 1991). But, ultimately, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98. On appeal, the trial court's findings will not be reversed unless they are clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 368 (1991).

*James v. Commonwealth*, 247 Va. 459, 461-62, 442 S.E.2d 396, 398 (1994).

As in *James*, we will assume that Chichester made a *prima facie* case of discrimination. *Id.* However, Chichester does not assert that the Commonwealth's explanation was insufficient to rebut the presumption or that it was pretextual.

*Voir dire* examination of prospective juror Angela Holland indicated that she had testified as a defense witness in a criminal case involving a family member or a friend and felt that the defendant had been unfairly convicted. Likewise, prospective juror Linda Allen testified that she had been charged with writing a "bad

check" and that her son had been shot and nothing had been done about it.

■ The Commonwealth explained that its strikes were based upon its assumption that both jurors' experiences might have created a bias or a feeling of resentment against the Commonwealth. In our opinion, this explanation amply rebuts any presumption of purposeful discrimination, and nothing in the record shows that the reasons were pretextual. Accordingly, we reject this contention.

## B. Racial Composition of Jury

■ Next, Chichester contends that since only one black person served on the jury, he did not "receive a fair trial representative of the percentages of the number of black [sic] residing in the community." However, Chichester cites no authority to support the contention that the law requires a representative percentage of blacks on the jury. Nor does he distinguish or discuss *Watkins v. Commonwealth*, 238 Va. 341, 347, 385 S.E.2d 50, 53 (1989), *cert. denied*, 494 U.S. 1074 (1990), in which we said that "[a]ll that is required is a fair selection system which does not systematically exclude any distinctive group in the community." (Citing *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)).

There is no evidence that there was a systematic exclusion of blacks from the venire selection process, and Chichester makes no such claim. Hence, we find no merit in this contention.

## C. Limitation of Defendant's Voir Dire Questions

Although the court permitted Chichester to ask a number of questions, he claims that the court erred in refusing to permit him "to ask all of his proffered *voir dire* questions and to ask many of those questions in the form so proffered. . . . [that were] relevate [sic] to the proper discovery of attitudes, back grounds [sic] and beliefs of prospective jurors as may be germane to the crime as charged." Chichester refers to no authority supporting this broad proposition and fails to identify any particular question the court amended or refused to permit him to ask.

■ Counsel has the right to ask "any relevant question to ascertain whether [the prospective juror] is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein." Code § 8.01-

358. However, the court must exercise its discretion in determining the relevancy of such questions and in deciding whether any questions that go beyond the statutory requirements should be asked. *LeVasseur v. Commonwealth*, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), *cert. denied*, 464 U.S. 1063 (1984). "A party has no right, statutory or otherwise, to propound any questions he wishes, or to extend *voir dire* questioning *ad infinitum*." *Id.*

Since Chichester failed to demonstrate that the trial court abused its discretion in its limitation of his proposed *voir dire* questions, we find no merit in this contention.

### D. Change of Venue

Without specifying how the "local media coverage" prejudiced his right to a fair trial, Chichester claims that the court erred in denying his motion for a change of venue. The court denied the motion when it was made some time before trial, but invited Chichester to renew the motion if and when it became difficult to select an impartial jury. The record does not disclose that "local media coverage" caused difficulty in selecting a fair and impartial jury, and Chichester did not renew his motion for a change of venue during the jury selection process. Accordingly, we will not consider this claim. Rule 5:25.

## VI. GUILT PHASE

### A. Admission in Evidence of Photographs

On brief, Chichester argues that the "the gory colored photographs" had no real value other than to infuriate the jury so it would be prejudiced against him. We disagree.

At trial, Chichester objected to the introduction of two photographs. One photograph was of Rigney's body, showing his chest wound, an extensive surgical cut across his chest that was made during rescue efforts, and evidence of his profuse bleeding. The other photograph illustrated Rigney's extensive bleeding in the area behind the cash register where he was shot.

The admission in evidence of photographs of a crime scene is a matter within the discretion of the trial court. *Spencer v. Commonwealth*, 238 Va. 295, 312, 384 S.E.2d 785, 796 (1989), *cert. denied*, 493 U.S. 1093 (1990). We think that these two photographs were relevant because, as was the case in *Spencer*, they

"tended to show motive, intent, method, malice, premeditation and the atrociousness of [Chichester's] crimes." *Id.* They were not inadmissible simply because they are gruesome or shocking. *Id.* Accordingly, the trial court did not abuse its discretion in admitting the two photographs.

### B. Evidence of Gun in Chichester's Possession when Arrested

 Chichester claims that the court erroneously admitted testimony of his possession of a hand gun when he was arrested, but makes no reference to that testimony. We find no such testimony; as a matter of fact, the officers who arrested Chichester listed the articles found in his possession and made no mention of any hand gun in his possession. Under these circumstances, we find no merit in this contention.

### C. Evidence of Chichester's Role in Joe's Pizza Crimes

Chichester contends that the court erred in admitting evidence linking Chichester to the robberies at Joe's Pizza. The principles controlling this issue are articulated in the following language:

Generally, evidence of other offenses should be excluded if offered merely to show that the accused is a person likely to commit the crime charged. But there are important exceptions to that rule. Evidence of other crimes is admissible if it tends to prove any fact in issue, even though it also tends to show the defendant guilty of another crime.

[O]ne of the issues upon which "other crimes" evidence may be admitted is that of the perpetrator's identity, or criminal agency, where that has been disputed. Proof of *modus operandi* is competent evidence where there is a disputed issue of identity.

. . . .

[E]vidence of other crimes, to qualify for admission as proof of *modus operandi*, need not bear such an exact resemblance to the crime on trial as to constitute a "signature." Rather, it is sufficient if the other crimes bear "a singular strong resemblance to the pattern of the offense charged." That test is met where the other incidents are "sufficiently

idiosyncratic to permit an inference of pattern for purposes of proof," thus tending to establish the probability of a common perpetrator.

*Spencer v. Commonwealth*, 240 Va. 78, 89-90, 393 S.E.2d 609, 616, *cert. denied*, 498 U.S. 908 (1990) (citations omitted).

■ If the evidence of other crimes bears sufficient marks of similarity to the crime charged to establish that the defendant is probably the common perpetrator, that evidence is relevant and admissible if its probative value outweighs its prejudicial effect. *Id.* at 90, 393 S.E.2d at 617. The trial court, in the exercise of its sound discretion, must decide which of these competing considerations outweighs the other. *Id.* Unless that discretion has been clearly abused, we will affirm the trial court's decision on this issue. *Id.*

Chichester contends that the only similarities between the two crimes were "that they both were committed by two individuals, who were masked wearing dark clothing. That evidence would have the same similarity of just about 100% of all robberies throughout the Nation let alone Virginia."

However, he overlooks additional significant similarities between the two robberies: Both robberies occurred within nine days and in close geographic proximity to each other; both robbers were black, one was taller than the other, both were armed; both robberies appeared to have been carefully planned to minimize the victims' opportunity to identify the robbers; both robbers wore masks and gloves; on each occasion, the taller man retrieved the spent cartridge after firing his gun; and in both robberies, the robbers fled from the scene on foot, rather than in a vehicle, to minimize the possibility of its identification.

Further, each robber appeared to be familiar with the premises and the role he was to play in the crimes. In both instances, the shorter man immediately went behind the counter to get the money from the cash register and appeared to know how to gain immediate access to the areas behind the counter.

In the Joe's Pizza robbery, the two men had visited the restaurant shortly before the robbery and had probably observed that nothing blocked immediate access to the area behind the counter. In contrast, a locked door barred customer access to the area behind the counter at Little Caesars. The shorter man seemed to know this because, immediately upon entering Little Caesars, he

jumped onto and over the counter to gain access to the area behind the counter. He also appeared to know that the door could be opened from behind the counter, because he opened it in his flight from that area after Rigney was shot. Other evidence in the case showed that McDowell's cousin was employed on another shift at Little Caesars, but was not working on the night of Rigney's murder. Further, the evidence indicated that the employees were instructed to lock the door to bar customer access to the area behind the counter, but the door was kept unlocked on the side behind the counter to permit employee access to the customer area.

In our opinion, the two robberies were sufficiently idiosyncratic and similar to each other to support an inference of a pattern of operation and the probability of common perpetrators. And given the evidence in this case, we cannot say that the trial court abused its discretion in concluding that the prejudicial effect of admitting evidence of Chichester's involvement in the Joe's Pizza robberies was outweighed by the probative value of that evidence.

Chichester also contends that the evidence should not have been admitted because (1) it was admitted in violation of an understanding between the Commonwealth's Attorney and Chichester's attorney giving rise to Chichester's guilty plea to some of the Joe's Pizza charges, and (2) the prosecutor was guilty of misconduct in presenting such evidence in violation of his agreement. The understanding was reflected in a letter that states in pertinent part:

> In the event that your client is charged with other crimes in the future, in this jurisdiction, the fact that he entered a plea of guilty in these cases will not be admissible in that trial, except to impeach his testimony. However, the facts and circumstances surrounding these offenses (including the cases which were nolle prosequied) and his conviction thereof may be introduced into evidence if relevant and otherwise admissible.

Although Chichester's counsel had seen this letter, he did not assert these grounds of objection during either phase of the trial; rather, he asserted them for the first time on a motion for a new trial. We will not consider grounds for an objection to evidence that were not timely asserted during trial. Rule 5:25.

In sum, we find no error in the admission of the evidence of Chichester's involvement in the Joe's Pizza robbery.

### D. Sufficiency of Evidence of Guilt

Chichester argues that the evidence is insufficient to sustain a conviction and that the trial court erred in failing to set aside the verdict on this ground. In another criminal case in which the defendant contended that the circumstantial evidence was insufficient to identify him as the perpetrator of a crime, we articulated the controlling principles in the following language:

> Applying well-established principles of appellate review, we must consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth. The burden is upon the Commonwealth, however, to prove beyond a reasonable doubt that [the defendant] was the perpetrator of the crimes. Additionally, circumstantial evidence is as competent, and entitled to the same weight, as direct testimony if such evidence is sufficiently convincing.

*Derr v. Commonwealth*, 242 Va. 413, 424, 410 S.E.2d 662, 668 (1991).

Chichester's argument is that "[a]t no time during the Little Caesar's Pizza trial was Carl Chichester ever identified as the perpetrator of the murder." However, Chichester overlooks the following substantial circumstantial evidence: (1) his role with McDowell in the Joe's Pizza robberies in which he was shown to be the taller of the two men; (2) his position as the taller man in front of the counter and McDowell's position behind the Little Caesars counter when Rigney was shot; (3) his identification by Burdette near the scene, shortly after Rigney's murder; and (4) his admission to Fairfax that "he had a body on the gun" Fairfax sold for him.

And, as in *Derr*, we consider the evidence as a whole in deciding whether it is sufficient to support the jury's findings that Chichester was the perpetrator of the crimes. "While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Stamper v. Commonwealth*, 220 Va. 260, 273, 257 S.E.2d 808,

818 (1979), *cert. denied*, 445 U.S. 972 (1980) (quoting *Karnes v. Commonwealth*, 125 Va. 758, 764, 99 S.E. 562, 564 (1919)). *See Derr*, 242 Va. at 425, 410 S.E.2d at 669. Considering the evidence as a whole, we hold that it is sufficient to support the jury's findings that Chichester committed the crimes. Therefore, we reject this contention.

## VII. PENALTY PHASE

■ Chichester argues that the court erred in admitting evidence of his arrest and conviction on a charge of carrying a concealed weapon in March 1990. The arresting officer testified that the concealed weapon was a .38 caliber revolver loaded with six hollow-point bullets, four of which were teflon coated. According to the arresting officer, teflon-coated bullets are designed to pierce bullet-proof vests.

This evidence was relevant and admissible as probative of Chichester's future dangerousness. *Pruett v. Commonwealth*, 232 Va. 266, 285, 351 S.E.2d 1, 12 (1986), *cert. denied*, 482 U.S. 931 (1987) (evidence of prior unadjudicated criminal conduct relevant to determination of future dangerousness). Hence, we reject this argument.

## VIII. CHICHESTER'S CONCLUSORY AND GENERAL ASSIGNMENTS OF ERROR

In summary fashion and stating no grounds, Chichester argues that all of his motions and objections made before, during, and after trial should have been sustained. We will not consider these general and conclusory assignments of error. Rule 5:25; *Spencer*, 240 Va. at 99-100, 393 S.E.2d at 622.

## IX. SENTENCE REVIEW

### *A. Passion and Prejudice*

■ Chichester argues that Rigney's mother and other family members were seated near the jury box for the purpose of "influencing the jury with passion." Chichester cites and we find nothing in the record to support his contention that the presence of these persons was designed to influence the jury. Hence, we find no merit in this contention. Rule 5:25.

Chichester also contends that the Commonwealth's peremptory strikes of the two prospective jurors who were black "was for no

other reason other than prejudice, because the defendant was black." For the reasons already stated, we conclude that these strikes were not made to prejudice Chichester.

One of Chichester's assignments of error is that "[c]ertain members of the jury were prejudiced toward a verdict of guilt and did not deliberate presuming appellants [sic] innocence." In support of that assignment he says only that he "does not believe that a jury of even make-up could review the evidence of his trial as quickly as they did in rendering a decision." However, Chichester cites nothing in the record to indicate how long the jury deliberated on the issue of guilt. The transcript indicates that the jury retired at 12:20 p.m. to begin deliberation on that issue. At times not shown in the record, the jury recessed for lunch and returned to deliberate that afternoon. Nor does the record indicate when the jury recessed that afternoon. On the second day it deliberated, the jury resumed at 9:03 a.m. and returned with a verdict at 10:06 a.m.

Given these facts, the record does not provide a predicate for either of Chichester's conclusions. Thus, we find no merit in this assignment of error.

██ In addition to our consideration of Chichester's assigned errors, we have reviewed the record pursuant to the provisions of Code § 17-110.1(C)(1) to determine whether Chichester's death sentence was "imposed under the influence of passion, prejudice or any other arbitrary factor." Following our review, we conclude the record contains no indication that the jury was influenced by any of these factors in fixing his punishment at death.

## B. Excessiveness and Proportionality

Chichester argues that his sentence of death was excessive and disproportionate to the penalty imposed in similar cases. To support this argument, he contends McDowell's charge for his role in Rigney's murder was "reduced to first degree murder," which "prevented him from receiving a death sentence." However, as we have pointed out,

comparisons between the penalties imposed upon codefendants may be unproductive. A determination of proportionality of punishment requires only that a defendant's death sentence not be incommensurate with his conduct, measured by

other jury decisions, on a statewide basis, involving similar conduct.

*Coppola v. Commonwealth*, 220 Va. 243, 258-59, 257 S.E.2d 797, 808 (1979), *cert. denied*, 444 U.S. 1103 (1980).

■ Consistent with *Coppola*, we have repeatedly held that imposition of a sentence less than death upon an accomplice does not establish that a defendant's death sentence is excessive or disproportionate. *Murphy v. Commonwealth*, 246 Va. 136, 145, 431 S.E.2d 48, 53, *cert. denied*, 510 U.S. ____, 114 S.Ct. 336 (1993); *Thomas*, 244 Va. at 26, 419 S.E.2d at 620; *King v. Commonwealth*, 243 Va. 353, 371, 416 S.E.2d 669, 679, *cert. denied*, 506 U.S. ____, 113 S.Ct. 417 (1992); *Stamper*, 220 Va. at 283-84, 257 S.E.2d at 824. Thus, we find no merit in Chichester's argument.

Pursuant to the mandate of Code § 17-110.1(C)(2), we must also consider whether Chichester's "death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

The defendant's record demonstrates his propensity for violence. On July 2, 1990, he was convicted of carrying a concealed weapon. The weapon, a revolver, was loaded with six cartridges with hollow-point bullets, four of which were teflon coated. Hollow-point bullets are designed to do the maximum damage to the person struck and teflon-coated bullets are designed to pierce bullet-proof vests.

Chichester pled guilty and was convicted of the attempted murder of Walls, a robbery charge, and a charge of the use of a firearm stemming from the Joe's Pizza incident, nine days before he murdered Rigney in the course of the robbery at Little Caesars. Additionally, Chichester used bullets designed to do maximum damage to the defenseless victims in his cold-blooded and unprovoked offenses against Rigney and Walls.

■ Keeping in mind the particular circumstances of this crime, we have reviewed the records in all capital murder cases pursuant to Code § 17-110.1(E), paying particular attention to those cases in which the underlying felony was robbery and the death penalty was based on "future dangerousness." Those cases are compiled in *Yeatts v. Commonwealth*, 242 Va. 121, 143, 410 S.E.2d 254, 267-68 (1991), *cert. denied*, 503 U.S. ____, 112 S.Ct. 1500 (1992). The following additional cases involving robberies

and findings of "future dangerousness" were decided after *Yeatts* and have been considered by us. *Swann*, 247 Va. at 239, 441 S.E.2d at 206-207, *Ramdass*, 246 Va. at 426-28, 437 S.E.2d at 573-74, and *Dubois v. Commonwealth*, 246 Va. 260, 267-68, 435 S.E.2d 636, 640 (1993), *cert. denied*, 511 U.S. ____, 114 S.Ct. 1389 (1994). We also reviewed the records in those cases in which life imprisonment was imposed under similar circumstances. *Whitley v. Commonwealth*, 223 Va. 66, 81, 286 S.E.2d 162, 171, *cert. denied*, 459 U.S. 882 (1982). Following our review, we conclude that Chichester's death sentence was neither excessive nor disproportionate to sentences generally imposed by sentencing bodies in Virginia for crimes of similar nature committed by defendants with records comparable to that of Chichester.

## X. CONCLUSION

We find no error in these cases, nor do we find any basis in the record to commute Chichester's death sentence to life imprisonment. Accordingly, we will affirm the judgments entered in the capital murder, robbery, and firearms cases.

Record No. 940130—*Affirmed.*
Record No. 940131—*Affirmed.*