COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Bumgardner and Felton
Argued at Salem, Virginia


KIEL TURNER

                                    MEMORANDUM OPINION* BY
v.    Record No. 1641-01-3          JUDGE WALTER S. FELTON, JR.
                                         NOVEMBER 26, 2002
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                    John J. McGrath, Jr., Judge

            W. Todd Watson (David B. Hargett; J. Paul
            Gregorio; Hargett & Watson, PLC; Paone &
            Gregorio, PLLC, on brief), for appellant.

            Margaret W. Reed, Assistant Attorney General
            (Jerry W. Kilgore, Attorney General, on
            brief), for appellee.


     Kiel Turner was convicted by a jury of:  (1) first-degree

murder in the commission of an attempted robbery, in violation

of Code §§ 18.2-32 and 18.2-18; (2) use of a firearm during the

commission of a felony, in violation of Code § 18.2-53.1; (3)

malicious wounding, in violation of Code § 18.2-51; (4) three

counts of abduction, in violation of Code § 18.2-47; (5)

breaking and entering with the intent to commit robbery, in

violation of Code § 18.2-90; (6) two counts of robbery, in

violation of Code § 18.2-58; and (7) attempted robbery, in

violation of Code §§ 18.2-58 and 18.2-26.  On appeal, he

────────────────────────

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

contends the trial court erred (1) in joining his case with other defendants when severance was required to prevent prejudice; (2) in denying his motion for a continuance to secure the presence of an impeachment witness; and (3) in denying his motion to set aside the verdict or declare a mistrial where the polling of the jury revealed that only eleven jurors concurred in the punishment verdict rendered by the jury. For the following reasons, we affirm the judgment of the trial court.

## I. BACKGROUND

### A. THE OFFENSES

On August 29, 1997, Emanuel Kingsley was shot in the chest and killed when he entered the house he was sharing with Anthony Brunk. Approximately two weeks prior to Kingsley's death, Kiel Turner asked Heather Blosser and Santia Frye if they knew of anybody who had money or drugs. He had recently been robbed of money and marijuana and wanted to replace his losses by robbing someone. Blosser told Turner that Kingsley was a drug dealer and had a great deal of money.

A few days prior to the murder, Blosser and Frye drove Turner to Massanutten and pointed out the house where Kingsley was living. Turner began asking the women specific questions about the residence, such as how many entrances there were and the time of day people were usually there. After staking out the residence, Turner enlisted the help of Andre Cook. Cook

-

agreed to help Turner commit the robbery, and he in turn enlisted the help of Marcus Duenas and LaLarnie Larry.

On the evening of August 28, 1997, Cook and Larry picked up Duenas in Washington D.C.  Duenas had with him his Glock nine-millimeter pistol.  After getting into the van, the three men drove around the corner and picked up a second gun, a chrome .45 caliber handgun.  Cook, Larry, and Duenas drove to Harrisonburg and at approximately midnight, picked up Turner at Rosslyn Williams' apartment.  That night Turner was wearing a black skullcap and Duenas' hair was "wild" and "bushed out."

Under Turner's direction, the four men drove to Massanutten.  They parked the van near Kingsley's house.  Turner handed out the guns.  Duenas took the Glock nine-millimeter pistol, Larry took his .380 caliber handgun, and Turner took the chrome .45 caliber handgun.  They walked through the woods to approach the house and then entered.  Upon entry, they split up and began looking for items to take.  Turner went upstairs and determined that two people were there.  Shana Curtis was in the bedroom studying, and Neil Flick was in the bathroom taking a shower.  Turner told Larry and Cook to come upstairs.

Larry and Cook seized Curtis in the bedroom while Turner went into the bathroom.  In the bathroom, Turner opened the shower curtain, put the .45 caliber chrome gun in Flick's face, ordered him out of the shower, and pistol-whipped him.  Flick and Curtis were then brought downstairs, ordered to lie down,

-

and were tied up.  Flick was repeatedly asked where the money was located and where Kingsley was.  Flick told them that Kingsley went out to get some food and would be back in fifteen minutes.  However, he stated he knew nothing about any money.  Larry then kicked Flick in the face, crushing his cheek bone and tear duct.

Shortly thereafter, Brunk returned home.  Brunk stated that upon entering the house, an African-American male with an afro "teased out a few inches" stuck a gun in his face and told him to hit the ground.  Brunk was tied up, and his watch, money clip, credit card, and shoes were taken.  By that time Larry and Cook had returned to the van to drop off the items that were taken from the house and its occupants.  While they were at the van, Kingsley and Amy Steward returned to the house.  When they entered the house, they were confronted by a man with a gun, who shot at them.  Steward was shot in the hand, but managed to escape by running through the woods.  Kingsley was shot in the chest and fell to the floor.

Duenas and Turner fled the house and ran to the van with their guns in their hands.  Cook and Larry testified that once inside the van, Duenas said he shot someone following a struggle.[1]  As they made their escape out of the neighborhood,

---

[1] Forensic evidence corroborates the statement that Duenas shot someone.  David Gibbs, a forensic scientist specializing in firearms and tool mark identification, testified that the bullets submitted to him were all nine-millimeter bullets fired

-

they passed Steward walking on the side of the road.  Larry testified that Turner recognized her as the woman he tried to shoot moments earlier at the house.  The four men returned to Washington D.C. and divided the stolen items.

Back at the house, Brunk managed to untie himself and then Flick.  Realizing the phone lines had been cut, Brunk used Kingsley's cellular phone to call 911.  Brunk and Flick then attempted to save Kingsley by administering CPR.  Kingsley died from his wound.

A few days following the shooting, Turner and the group gathered at Cook's house.  It was at that time they learned that Kingsley had died.  Cook testified that Duenas subsequently decided to get rid of the nine-millimeter pistol.  He dismantled it, burned it, and threw it in a river.

B.  PROCEDURAL HISTORY

Prior to trial the Commonwealth filed a motion to join the trials of codefendants Turner, Duenas, Larry, and Frye.  Over the objections of the codefendants, the motion was granted. Trial began on December 18, 2000.  Prior to opening remarks, Turner stated that a defense witness, Aaron Primes, was not present and requested a continuance.  He stated that Primes would provide crucial exculpatory testimony.  To ensure his

_____

from the same gun.  Duenas had the Glock nine-millimeter pistol during the murder-robbery.

-

appearance, Turner's counsel subpoenaed Primes by personal service three months before trial and spoke to him by telephone the day of trial regarding his testifying on behalf of Turner.

The trial court denied the continuance motion and issued a capias for Primes. In turn, Turner proffered the anticipated testimony of Primes. The proffered evidence was that while Primes was incarcerated with Cook around August 28 or 29, 2000, Cook told him that he was going to do anything to save his neck and that Turner never went into the house. At trial, Cook denied ever talking with Primes about the murder-robbery incident.

On December 20, 2000, Primes, for the third time in as many days, failed to appear in court. Turner's attorney indicated to the trial court that he was reluctant to continue without "a crucial witness." He again requested a continuance, but was denied. The court held, and Turner's attorney agreed, that Primes' testimony would be cumulative and that there was no way to guarantee his appearance at trial.[2]

---

[2] Irvin Majors' testimony was virtually identical to the proffered testimony of Primes. Majors testified at trial that while in a holding cell with Cook, Cook told him that if he went down he was going to take others with him. In addition, Majors testified that Cook stated Turner was in the car during the whole thing.

-

Turner was convicted of ten of the eleven crimes with which he was charged.[3]  After the court read each verdict, the jury was asked collectively by the trial judge, "Is this your verdict?"  Each time the record reflects that there was an affirmative nod or response by the jurors, affirming the verdict to be his or hers.  Turner's attorney then moved for the jury to be individually polled.  After individual polling of the jurors, the record reflects that each of the jurors responded that the announced verdicts were his or hers.  No juror dissented to the announced verdicts.

At the conclusion of the jury's deliberation during the sentencing phase, the jury foreperson announced in open court the jury's sentencing verdict as to each charge.  The trial judge subsequently asked the jury, "Is this everyone's verdict? Let the record show all have responded in the affirmative."

Thereafter, Turner requested that each juror be polled individually to determine if all ten verdicts were his or her own.  The trial court charged the jury:

> COURT:  Ladies and gentlemen, again Mr.
> Harper is going to call your name.  If these
> are your verdicts collectively, Commonwealth
> versus Keil [sic] Turner, please respond
> yes.  If they are not your verdicts, any one
> or more of them are not your verdicts,
> please respond no.  Thank you.

---

[3] Turner was acquitted of the malicious wounding charge in relation to Amy Steward.  Duenas was acquitted of the malicious wounding charge in relation to Neil Flick.

-

The transcript indicates that only eleven of the jurors responded. However, following the individual polling of the jury, the court stated, "The record can show that each of the jurors have responded that they are his or her verdicts in total." Furthermore, prior to and following the individual polling of the jurors, the court noted for the record that each of the jurors confirmed that the sentencing verdict was theirs. At no point during the polling of the jury did any juror dissent to the announced verdicts.

As a result of the apparent non-response by a juror, Melissa Putnam, to the polling, Turner's attorney filed a post-trial motion requesting that a mistrial be declared. He argued, among other things, that the jury polling did not reflect a unanimous verdict as to punishment. Because Turner failed to make a timely objection at the time the individual polling occurred, the motion was denied.

On April 6, 2001, a hearing was held regarding the individual polling. Juror Putnam testified that she recalled being polled as to guilt and punishment. She stated there was no point at which the other eleven jurors' names were called and hers was not. The court reporter was also called to testify. She stated that she listened to the tape recording of the sentencing proceedings and was unable to detect Ms. Putnum's voice. The court denied the motion for a mistrial, holding that

-

it had been incumbent upon the counsel requesting the polling to inquire as to the twelfth person.

## II.  JOINDER OF CODEFENDANTS

We first consider whether the trial court erred in denying Turner's motion to sever his trial from the trials of his codefendants.  Code § 19.2-262.1 provides:

> On motion of the Commonwealth, for good cause shown, the court shall order persons charged with participating in contemporaneous and related acts or occurrences or in a series of acts or occurrences constituting an offense or offenses, to be tried jointly unless such joint trial would constitute prejudice to a defendant.  If the court finds that a joint trial would constitute prejudice to a defendant, the court shall order severance as to that defendant or provide such other relief justice requires.

To prevail on appeal, Turner must demonstrate that he suffered actual prejudice as a result of the joint trial.

> "In determining whether a joint trial would prejudice a defendant, the trial court should require '[t]he party moving for severance [to] establish that actual prejudice would result from a joint trial.'" Goodson v. Commonwealth, 22 Va. App. 61, 71, 467 S.E.2d 848, 853 (1996) [(citations omitted)].  Actual prejudice results only when "there is a serious risk that a joint trial would compromise a specific trial right of [defendant], or prevent the jury from making a reliable judgment about guilt or innocence." Barnes v. Commonwealth, 22 Va. App. 406, 412, 470 S.E.2d 579, 582 (1996) (quoting Zafiro v. United States, 506 U.S. 534, 539, 113 S. Ct. 933, 938, 122 L.Ed.2d 317 (1993)).

-

> We recognize that prejudice may result when evidence inadmissible against a defendant, if tried alone, is admitted against a codefendant in a joint trial. See id. However, a "defendant has no right to exclude relevant and competent evidence, such as the testimony of a former co-defendant," id. at 412-13, 470 S.E.2d at 582, despite "the impression that [they] may be hostile to each other's position." Goodson, 22 Va. App. at 71, 467 S.E.2d at 853. "'The risk of prejudice will vary with the facts in each case,'" and the decision to permit a joint trial is entrusted to the sound discretion of the trial court. Barnes, 22 Va. App. at 412, 470 S.E.2d at 582 (quoting Zafiro, 506 U.S. at 541, 113 S. Ct. at 939); see Code § 19.2-262.1. The court must balance the specter of prejudice with "the effectiveness of . . . measures to cure any such risk, such as limiting instructions." Barnes, 22 Va. App. at 412, 470 S.E.2d at 582.

Adkins v. Commonwealth, 24 Va. App. 159, 162-63, 480 S.E.2d 777, 779 (1997).

Turner contends that joinder was improper because he and his codefendants had markedly different degrees of culpability. The different degrees of culpability, he asserts, created confusion and prejudice because it reduced the confidence that should be part of a jury verdict. Despite the varying degrees of culpability claimed, Turner fails to show that he suffered actual prejudice during the course of his trial.

No evidence was admitted in the other cases that was not admissible in Turner's case. In addition, the jury displayed no confusion in determining the individual liability of the codefendants. The jury acquitted Turner of the malicious

-

wounding of Amy Steward and acquitted Duenas of the malicious wounding of Neil Flick.  That Turner and Duenas were acquitted on different malicious wounding charges indicates that the jury understood the varying degrees of culpability.  The record fails to show that Turner's trial rights were affected or that the jury process was compromised.  Accordingly, the trial court did not err by denying Turner's motion to sever his trial from the trials of his codefendants.

### III.  MOTION FOR CONTINUANCE

We next consider whether the trial court erred by denying Turner's motion for a continuance to secure the appearance of a witness.  "Whether to grant or deny a continuance of a trial is a matter that lies within the sound discretion of a trial court, and its ruling will not be reversed on appeal unless it is plainly wrong.  A court must exercise this discretion in a manner that does not prejudice a defendant's right to a fair and impartial trial or deprive him of his constitutional right 'to call for evidence in his favor.'"  Cardwell v. Commonwealth, 248 Va. 501, 508-09, 450 S.E.2d 146, 151 (1994).  "The burden is on the party seeking the continuance to show that it is likely that the witness would be present at a later date, and would testify in the manner indicated in the proffer."  Chichester v. Commonwealth, 248 Va. 311, 322, 448 S.E.2d 638, 646 (1994).  A court need not continue a case indefinitely when there is no

-

assurance that a witness can be located.  Bryant v.

Commonwealth, 248 Va. 179, 182-83, 445 S.E.2d 667, 669 (1994).

Turner argues that the trial court abused its discretion in denying his motion for a continuance in order to secure the presence of his witness, Aaron Primes, because Primes would have impeached Cook's testimony that Turner was in the house at the time of the shooting.  We disagree.

Several months prior to trial Turner properly obtained a subpoena and assured personal service on Primes.  The day of trial, Turner's attorney spoke to Primes who assured him that he would appear in court.  Primes failed to appear, however.  He also failed to appear in the general district court in the same jurisdiction for his own criminal trial.  Turner subsequently proffered to the trial court the statements to which Primes was to testify.  Those statements were essentially the same as those about which Irvin Majors testified.  We find that the trial court reasonably concluded that Primes' testimony was cumulative and that there was no assurance he would appear at a later date.  Further, Turner suffered no prejudice as a result of the denial of his motion for a continuance, and the trial court neither erred nor abused its discretion.

## IV.  POLLING OF THE JURY

We lastly consider whether the trial court erred in denying Turner's motion to set aside the verdict, or for mistrial, as a result of the alleged failure of the record to reflect a

-

unanimous verdict with regard to sentencing.  Rule 5A:18

provides, in relevant part:

> [n]o ruling of the trial court . . . will be
> considered as a basis for reversal unless
> the objection was stated together with the
> grounds therefor at the time of the ruling,
> except for good cause shown or to enable the
> Court of Appeals to attain the ends of
> justice.

During the sentencing phase, Turner's attorney requested

that the jury be polled collectively after the sentence was

imposed.  Collectively, the jurors were asked whether the

sentence verdicts were theirs.  The court noted the jury's

response stating, "Let the record show all have responded in the

affirmative."  There was no dissent by any of the jurors that

the announced sentencing verdicts were not theirs.  Thereafter,

each juror was polled individually to determine if all ten

sentencing verdicts were his or her own.  Following the

individual polling, the court stated, "The record can show that

each of the jurors have responded that they are his or her

verdicts in total."  Again, there was no dissent to any of the

sentencing verdicts by any of the jurors, and no objection by

the attorneys, even though the transcript reflects that only

eleven of the jurors responded to the individual polling.

On April 6, 2001, a hearing was held regarding the polling.

Juror Melissa Putnam testified that she recalled being polled

both as to guilt and to punishment.  Furthermore, she stated

there was no point at which the other eleven jurors' names were

-

called and hers was not.  Since Turner failed to object to the individual polling of the jury at the time the poll was taken, thus preventing the trial court from correcting any error or determining if any individual juror opposed the sentencing verdicts, he cannot raise the issue for the first time on appeal.  <u>See</u> Rule 5A:18.  Moreover, the record reflects no reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

The judgment of the trial court is affirmed.

<u>Affirmed.</u>

-